**Richard VIETH, Norma Jean Vieth, and Susan Furey, Plaintiffs**

v.

**Commonwealth of PENNSYLVANIA, et al., Defendants**

**No. CIV.1:CV–01–2439.**

United States District Court, M.D. Pennsylvania.

April 8, 2002.

Daniel T. Brier, Donna A. Walsh, Myers Brier & Kelly, LLP, Scranton, PA, Robert B. Hoffman, Reed Smith LLP, Harrisburg, PA, Paul M. Smith, Thomas J. Perrelli, Bruce V. Spiva, Daniel P. Mach, Brian P. Hauck, Jenner & Block, L.L.C., Washington, DC, for plaintiffs.

J. Bart DeLone, Office of Atty. Gen., Harrisburg, PA, for Commonwealth of Pa., Mark S. Schweiker, Kim Pizzingrilli, Richard Filling, defendants.

John P. Krill, Jr., Linda J. Shorey, Helene Eichenwald Loux, Jason E. Oyler, Julia M. Glencer, Kirkpatrick & Lockhart LLP, Harrisburg, PA, for Robert C. Jubelirer, Matthew J. Ryan, Republican Caucus of Pennsylvania House of Representatives, defendants.

### OPINION AND ORDER
### OF THE COURT

PER CURIAM.

In our previous order of February 22, 2002, we dismissed several claims brought by the Plaintiffs which challenged the constitutionality of Pennsylvania Senate Bill 1200 (Act 1), the congressional redistricting plan enacted by the General Assembly and signed into law on January 7, 2002. On March 11–12, 2002, we held a hearing

on the Plaintiff's sole remaining claim: Act 1 violates the constitutional principle of "one-person, one vote." Upon conclusion of this hearing, we ordered the parties to file proposed findings of fact and conclusions of law.

## I. Background

The 2000 Census reported that Pennsylvania's total population was 12,291,054 persons. As a result of this population figure, and in accordance with Article I, Section 2 and the Fourteenth Amendment to the United States Constitution, Pennsylvania's congressional delegation was reduced from twenty-one to nineteen representatives in Congress.[1]

The loss of two congressional seats made it necessary to increase the size of the existing districts by approximately 100,000 persons. Additionally, because of shifts in population, some congressional districts were over-populated while some were well under the ideal population. Therefore, significant changes were made to the existing congressional districts.

Pennsylvania Senate Bill 1200 was introduced by Senators Brightbill and Lemmond on November 16, 2001. Senators Brightbill and Lemmond are members of the Republican Party. A competing plan, Senate Bill 1241 was introduced by Democratic state senators Mellow, O'Pake, Wagner, Musto, Kasunic, Fumo and Stout. On December 10, 2001, the Senate considered amendments to Senate Bill 1200. A Republican amendment was ultimately agreed to. The version of Senate Bill 1200 that eventually passed the Senate con-

tained a population deviation of twenty-four persons.

After an amendment by the Pennsylvania House of Representatives, that chamber passed Senate Bill 1200 on December 12, 2001. The version of Senate Bill 1200 that passed the House had a total population deviation of nineteen persons.[2] It also maintained two minority-majority districts in the Philadelphia area, created one open seat in the southeastern part of the Commonwealth and paired two Democratic incumbents in the same district. One Democratic incumbent was paired against one Republican incumbent.

The Senate refused to concur in the amendments to Senate Bill 1200 offered by the House of Representatives. A Conference Committee was appointed and a plan was eventually devised that contained a nineteen person deviation. This Conference Committee Report on Senate Bill 1200 was passed by the Senate on January 3, 2002 and by the House of Representatives later the same day. It was signed into law on January 7, 2002.

In its final form, Act 1 created nineteen congressional districts with a total population deviation of nineteen. Although Act 1 did maintain two "minority-majority" districts in Philadelphia, it created three districts in which six incumbent congressman would have to run for re-election against each other. Of these pairings, two of the districts required Democratic congressmen to run against each other and one district required an incumbent Democratic representative to run against an incumbent Republican representative. These pairings of

---

1. Article I, Section 2 states in pertinent part: "The House of Representatives shall be composed of Members chosen every second year by the People of the several States, and the Electors of each State shall have Qualification requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art I, § 2. Section 2 of the Fourteenth Amendment states in pertinent part: "Representa-

tives shall be apportioned among the several states according to their representative numbers, counting the whole number of persons in each state." U.S. Const. amend. XIV, § 2.

2. The term "deviation" as used in this opinion refers to the differences in population between the least and most populated districts under the redistricting plan.

incumbent congressman permitted the creation of an open congressional district in the southeastern part of the Commonwealth. In contrast to its treatment of Democratic incumbents, no Republican congressmen are forced to run against each other.

Moreover, Act 1 splits eighty-four local governments, including twenty-five counties, fifty-nine cities, boroughs or townships, as well as forty-one wards. It also splits six voting precincts.

## II. Analysis

### A. Population Deviation

■ The United States Constitution requires that each congressional district in a state contain equal population. *See Wesberry v. Sanders*, 376 U.S. 1, 18, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964) (holding that Art. I, § 2 of the Constitution requires that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's."). The Supreme Court has been exceedingly clear in requiring lower courts to balance population among the districts with precision. *See Karcher v. Daggett*, 462 U.S. 725, 734, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983) ("there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2 without justification."); *Kirkpatrick v. Preisler*, 394 U.S. 526, 531, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) ("[T]he 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality. Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small."). In a challenge to a congressional redistricting plan, the plaintiff bears the burden of proving that the differences in district-to-district population could have been reduced or eliminated altogether by a "good-faith effort to draw districts of equal population." *Karcher*, 462 U.S. at 730, 103 S.Ct. 2653.

■ We find that the Plaintiffs have met their burden in this case. First, it is undisputed that Act 1 has a deviation in population of nineteen persons between the most populated and least populated districts. Therefore, unless these deviations were unavoidable or resulted despite a good faith effort to draw districts of equal population, then the Defendants must prove a legitimate justification for the deviations. The evidence conclusively demonstrates that this population deviation was avoidable. Plaintiffs presented into evidence "Alternative Plan 4" which had a minimum possible deviation—districts that differ by only one person. Additionally, this plan achieves zero deviation without splitting any precincts among congressional districts and splits fewer municipalities than Act 1. Witnesses presented by both parties testified that it would have been relatively easy to take any plan or map and reach a point of zero population deviation.[3] Indeed, the Defendants them-

---

**3.** The Defendants suggest that "Alternative Plan 4" cannot be considered because it was never before the legislature. They argue that Plaintiffs must meet their burden under the first prong of the *Karcher* test only by relying on maps and/or redistricting plans that have a lower population deviation than the one enacted *and* that were presented to the legislature. We disagree. Although in *Karcher*, the legislature had before it other plans with less deviation, the Court never endorsed such a requirement. Instead, the Court focused on whether a plan with less deviation was possible. In this case, the Plaintiffs have provided four plans that had less deviations than Act 1. If we were to adopt the limited analysis suggested by the Defendants, we would be adopting a view that would isolate grossly disproportionate plans from constitutional scrutiny on the sole basis that such plans constitute the plan with the least deviations *available*. *Karcher* is wrought with references indicating that the least deviation *possible* is that which

selves submitted a map with zero population deviation. Thus, the nineteen person deviation in Act 1 was avoidable.

Nor can the deviation contained in Act 1 be excused based upon the good faith of the Defendants. Indeed, we find that the testimony of defense witness Dr. John Memmi satisfies the Plaintiff's burden here. Dr. Memmi testified that he was in charge of drawing up the map that became Act 1. He further stated that he drew the map under the direct supervision of the Republican leadership. He began manipulating the map in order to get the deviations lower. However, once he reached the point of a nineteen-person deviation, he was told to stop manipulating the map:

Q: Actually, what I would like to know is if there was a number that anybody said you could stop once you got to number nineteen or number 18?

A: Every move that was made was done under the supervision of my supervisors. And at the time, the team involved the House Republican Caucus Redistricting crew, some members thereof, the Senate Republican Caucus Redistricting team, members thereof. And the Supervisors sat there while Bill Shower and I—Bill is a gentleman with the House Republican Caucus. They observed every census block move that we made. And we continued to make moves, and were monitoring the overall range. I should say we all monitored it, of course, but the supervisor's the one whose monitoring counted. And when the districts were at nineteen overall range, they said that is sufficient.

Tr. Vol 3 at page 276. No other witnesses were called by the Defendants to explain why Dr. Memmi was told to stop manipulating the map.

We find this testimony to be in clear violation of the Supreme Court's express goal of getting as close as possible to zero deviation when drawing congressional districts. *See Karcher*, 462 U.S. at 734, 103 S.Ct. at 2660. Therefore, we find that the Defendants did not put forth a good-faith effort to draw districts of equal population.

It has been suggested that the deviation from absolute numerical equality present in Act 1 is too trivial or minute to rise to a constitutionally significant level. While it is true that the deviation contained in Act 1 is small, *Karcher* specifically holds that "there are no *de minimis* variations which could practically be avoided, but nonetheless meet the standard of Art. I, § 2 without justification." 462 U.S. at 734, 103 S.Ct. at 2660. Thus, we hold that the population deviation in Act 1, even though relatively small, enables the Plaintiffs to satisfy *Karcher's* first prong and shifts to the Defendants the burden of proving justification.

should govern the analysis. *See* 462 U.S. at 727, 103 S.Ct. 2653 (affirming the three-judge panel's conclusion that the New Jersey plan violated the one-person, one-vote requirement "because the population deviations among districts, although small, were not the result of good-faith effort to achieve *population equality*") (emphasis added); 462 U.S. at 732–33, 103 S.Ct. 2653 (stating that the Court requires that *"absolute population equality* be the paramount objective of apportionment . . . in the case of congressional districts," but not necessarily for other forms of redistricting) (emphasis added); 462 U.S. at 730, 103 S.Ct. 2653 (stating that under the first prong of the analysis "the court must consider whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of *equal population*") (emphasis added); 462 U.S. at 731, 103 S.Ct. 2653 ("Adopting any standard other than *population equality*, using the best census data available . . . would subtly erode the Constitution's ideal of *equal representation*.") (emphasis added). In this case, the evidence indicates that a zero-deviation map was possible, and thus should govern our analysis under *Karcher's* first prong.

### B. Justification

■ Because the Plaintiffs have met their burden under *Karcher*, the Defendants must now prove that this population deviation was "necessary to achieve some legitimate goal." 462 U.S. at 731, 103 S.Ct. at 2658 (*citing Kirkpatrick*, 394 U.S. at 530, 89 S.Ct. at 1228; *Swann v. Adams*, 385 U.S. 440, 443–444, 87 S.Ct. 569, 571–72, 17 L.Ed.2d 501 (1967)). While *Karcher* did not specify how the State might meet its burden in step two, it did give several examples of legislative policies that might justify some variance among the populations of the State's various congressional districts. Specifically, the Court stated that "making districts compact, respecting municipal boundaries, preserving the cores of prior districts and avoiding contests between incumbent Representatives" may legitimate minor population deviations among congressional districts. The Court also made clear that the burden borne by the State varies inversely with the magnitude of the population deviation. *Id.* at 741, 103 S.Ct. at 2664. That is, the greater the deviation, the more compelling the government's justification must be.

■ Defendants contend that the population variances in Act 1 are justified by a desire to avoid splitting voting precincts.[4] Both parties agree that splitting precincts creates additional costs and work for county election officials in acquiring voting machines, in customizing ballots, in training precincts officials, in registering voters and in counting ballots. Moreover, we recognize that split precincts increase the potential for voter disorientation and candidate confusion. Therefore, to the extent that such justification is genuine, we acknowledge that the desire to avoid splitting precincts is a legitimate state interest which could justify a nineteen person deviation.

We find, however, that the Defendants' arguments on this point are a mere pretext. Specifically, the evidence has demonstrated that it is possible to draw a congressional district map with zero deviation and no precinct splits. Plaintiffs' witness, Robert Priest, drew exactly such a map using the same tools as Dr. Memmi. However, unlike Dr. Memmi, Mr. Priest was free to draw the map by manipulating entire precincts from district-to-district in order to achieve absolute population equality. As we have previously pointed out, Dr. Memmi testified that he was more constrained by his superiors. According to that testimony, Dr. Memmi initially formulated three congressional districts of ideal population by manipulating entire precincts. However, at that point, he was instructed to stop using whole precincts and to begin using census blocks to lower the deviation. Because every voting precinct contains several census blocks, manipulation of the census blocks leads almost inextricably to splitting precincts. We also note that none of the congressional districts that have split precincts have an ideal population.

Dr. Memmi was equally restrained in his efforts to bring Act 1 down to a zero deviation. That is, his superiors in the Republican caucus instructed him that he was only to manipulate census blocks and not precincts. This wholesale reliance on the census block method—the lone cause of the precinct splits—is what Defendants now employ to justify the deviations in their map. The logical inconsistency is so deep that it causes us to pause and consider the sincerity of such proffer. If De-

---

4. While the Defendants have suggested various other state interests which may have justified Act 1, since the focus of our inquiry in the justification phase is population deviation, the only justification submitted which deals with that issue is the policy objective of limiting voter precinct splits. Therefore, we will confine our analysis to this issue.

fendants truly wanted to avoid splitting precincts, they would have done so by enacting a zero deviation map that did not split *any* precincts.

Moreover, it is worth noting that of the maps presented at trial, Act 1 is that which least comports with the neutral legislative policies that the *Karcher* Court stated would justify a Congressional redistricting plan with some deviations. Act 1 is the plan which contains the least compact districts. (Pls. Ex. 12 at 7.) Act 1 splits the most counties (twenty-five) and municipalities (fifty-nine cities, townships, or boroughs).[5] (*Id.*) With the exception of Act 1's twin, the zero-deviation version, Act 1 even splits the most precincts. (*Id.*) To the extent that Act 1 retains the cores of prior districts, it does so only for districts containing Republican incumbents. (*See id.* at 8.)

However, it is on *Karcher*'s final endorsed neutral criteria—the avoidance of contests between incumbents—that Act 1 fails most miserably. Although Pennsylvania's loss of two congressional seats requires the pairing of only two sets of incumbents in the 2002 elections, Act 1 pits six incumbents against each other: two pairs of Democrats, and one Republican against one Democrat (the latter in a district that heavily favors Republican candidates). At the same time Act 1 pits more incumbents than necessary against one another, it also creates a new district, District 6, in which no incumbent resides. In the face of such evidence, it is clear that *Karcher*'s neutral criteria were not high on the priority list in enacting Act 1.

The dissent suggests that our analysis should pay deference to the policies that Act 1 reflects. However, there is no legal authority to support the corollary assertion that the only relevant zero-deviation

maps with no precinct splits are those which comport with the general contours of Act 1.

In summation, it has been conclusively proven that it is possible to draw a congressional district map with zero population deviation amongst districts without splitting any precincts. Therefore, Defendants cannot rely on a general desire to avoid splitting precincts as a legitimate justification for a map that splits six such precincts. Put another way, if it is possible to achieve a zero deviation map with no precinct splits by manipulating whole precincts, the actions of the Defendants in switching to census block data call into question the legitimacy of their proffered justifications. We find, therefore, that the Defendants have failed to provide any legitimate justification for the population deviations contained in Act 1. As such, we enjoin the implementation of Act 1.

## III. Remedy

Having determined that Act 1 is unconstitutional, we now address the question of the appropriate remedy. The Supreme Court has cautioned that "reapportionment is primarily a matter for legislative consideration and determination, and that judicial relief becomes appropriate only when a legislature fails to reapportion according to federal constitutional requisites in a timely fashion after having had an adequate opportunity to do so." *White v. Weiser*, 412 U.S. 783, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973). We recognize that the Pennsylvania General Assembly has primary jurisdiction over congressional redistricting. Furthermore, no evidence was presented that would permit us to conclude that the General Assembly would be unable to enact a new constitutional redistricting plan in time for the 2002 elections.

**5.** In comparison, the now defunct 1992 Plan, which contained twenty-one congressional districts, split only eighteen counties and thirteen municipalities.

This is not a case where the respective legislative bodies are hopelessly deadlocked and the likelihood is that they will be able to enact a constitutionally sound plan.

Therefore, the Defendants are ordered to submit a constitutionally sound redistricting plan that has been enacted into law by the Commonwealth of Pennsylvania to this court within three weeks of the date of this opinion.

An appropriate order will follow.

### ORDER

In accordance with the preceding opinion, **IT IS HEREBY ORDERED THAT:**

(1) Plaintiffs' request for declaratory judgment is **GRANTED**. Act 1 is hereby declared unconstitutional as a violation of Article I, § of the United States Constitution;

(2) Plaintiffs' request for injunctive relief is **GRANTED IN PART** as follows:

(A) To the extent that Plaintiffs request that the court enjoin Act 1's implementation, Plaintiffs' request is **GRANTED**. Defendants are permanently enjoined from implementing Act 1;

(B) To the extent that Plaintiffs request that the court devise its own redistricting plan for use in the 2002 congressional elections, Plaintiffs' request is **deferred pending compliance by the Pennsylvania General Assembly with this order;** and instead,

(3) The Pennsylvania General Assembly shall, within three weeks of the date of this order, prepare, enact and submit for review and final approval by this Court, a congressional redistricting plan in conformity with this opinion.

This Court shall retain jurisdiction pending issuance of a final order in this matter.

IT IS SO ORDERED.

YOHN, District Judge, Dissenting.

I agree with majority that the plaintiffs have met the first prong of the *Karcher* test and that the appropriate remedy, if Act 1 is unconstitutional, is to give the Commonwealth of Pennsylvania a reasonable period of time to enact a constitutionally sound redistricting plan.

I respectfully dissent, however, from Section II.B. of the majority opinion and conclude that defendants have met their burden, although just barely, to establish a justification for the nineteen person maximum deviation, and that Act 1 therefore passes constitutional muster.

In *Karcher v. Daggett*, 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Court stated that the plaintiffs' "success in proving that the *Feldman* Plan was not the product of a good faith effort to achieve population equality means only that the burden shifted to the state to prove that the *population deviations* in its plan were necessary to achieve some legitimate state objective." (emphasis added). 462 U.S. at 740, 103 S.Ct. 2653. Thus, the focus of the second prong of the *Karcher* test is the state's justification for the population deviations in Act 1.[6]

The defendants have pointed to a litany of state interests behind Act 1; however, since the focus of our inquiry in the justification phase of the *Karcher* analysis is the

**6.** The majority correctly points out that the Court has "made clear that the burden borne by the state varies inversely with the magnitude of the population deviation.... That is, the greater the deviation, the more compelling the government's justification must be."

It would seem therefore that a nineteen person deviation in a congressional district of 646,371 or 646,372 would require a justification on the lowest end of the "justification" scale.

population deviation, the only justification submitted which deals with that issue is the policy objective of limiting voter precinct splits. Defendants contend that Act 1 could be "zeroed-out" by using Modification One but that this would entail splitting twenty-six voting precincts rather than the split of six voting precincts in Act 1.

Both parties agree that splitting precincts creates additional costs and work for county election officials in acquiring voting machines, in customizing ballots, in training precinct officials, in registering voters and in counting ballots. In addition, it increases the potential for voter confusion and candidate confusion. Thus, the desire to minimize the splitting of voting precincts is a legitimate justification, particularly when the overall population deviation is only nineteen.

The evidence with reference to this justification is, however, minimal. Dr. John Memmi testified that he was the cartographer who worked on the final draft of what became Act 1. When he reached the population deviation of nineteen he was told by his superiors that he could stop work. Inexplicably, neither party asked Dr. Memmi who told him this or called as a witness the person who told him to stop work in order to explore the basis for the decision. As a result, we are left to draw inferences from the evidence presented.

Defendants ask us to draw the inference that the effort to equalize population was halted because of a desire not to split any more voting precincts. There are 9,427 voting precincts in Pennsylvania but there are 322,424 census blocks. Act 1 as enacted contained six voting precinct splits. (Defendants' exhibit 92). Subsequent to the enactment of Act 1 Dr. Memmi made further adjustments of census blocks in order to produce a plan with a zero population deviation. Using census blocks inevitably leads to more voter precinct splits and the resulting plan, designated as Mod-

ification One contains twenty-six voting precinct splits. (Defendants' exhibit 90).

This inference is also supported by the testimony of Dr. Memmi concerning the conversation when he was working on the last draft of what became Act 1 and told that he could stop work.

Q Did they tell you why they thought that was sufficient?

A They did not specifically say John, Bill, these are the reasons why we are stopping at 19. I don't mean to be curt. One of the prevailing themes throughout the exercise was to minimize the number of precinct incursions. We were at six. I worked with individuals who understand the election process. They understand the administration at the county level.

I do not profess to have any more than at best a superficial understanding of that. But the concern was to minimize the number of precinct incursions so that election administration would be as smooth as it could be.

R. at 320—21.

Finally, I note that neither party has, even with the benefit of hindsight, submitted a plan following the general contours of Act 1 which does not involve the splitting of more than six voting precincts. Thus, I find that the inference defendants suggest, that the justification for Act 1 is the reduced number of voting precinct splits, is reasonable.

Plaintiffs, on the other hand, ask us to infer that the Act 1 plan was not "zeroed out" because of partisan considerations. Plaintiffs produced a map that was "zeroed out" without splitting any voting precincts, Alternative Four. However, this plan does not follow the general contours of Act 1. The Court has oftentimes reminded us of the necessity not to override state goals, policies and preferences any more than is

necessary. *See Abrams v. Johnson,* 521 U.S. 74, 101, 117 S.Ct. 1925, 138 L.Ed.2d 285 (1997); *Upham v. Seamon,* 456 U.S. 37, 41–42, 102 S.Ct. 1518, 71 L.Ed.2d 725 (1982); *White v. Weiser,* 412 U.S. 783, 795, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973). There is no evidence to support a conclusion that Alternative Four encompasses the many other state goals, policies and preferences inherent in Act 1 which resulted in its enactment. In addition, plaintiffs have suggested no connection between the nineteen person deviation in Act 1 and the alleged partisanship of the plan. Indeed, any such suggestion is contradicted by Dr. Memmi's specific testimony that when he was trying to reduce the plan to the minimal population deviation possible on December 31, 2001, nobody expressed any concern that continuing to trade whole precincts might change the political characteristics of some of the districts and that during the entire procedure there was no commentary of a political nature. R. at 322. Moreover, to the extent that the plaintiffs are arguing partisan gerrymandering, the *Karcher* Court noted that "beyond requiring states to justify population deviations with explicit, precise reasons, which might be expected to have some inhibitory effect, *Kirkpatrick* does little to prevent what is known as gerrymandering.... *Kirkpatrick's* object, achieving population equality, is far less ambitious than what would be required to address gerrymandering on a constitutional level." *Karcher,* 462 U.S. at 734 n. 6, 103 S.Ct. 2653. Thus, the inference which the plaintiffs ask us to draw is not supported by the evidence, by reason, or by law.

I conclude, therefore, that the nineteen person deviation was justified by the "legitimate state objective" of avoiding further splitting of voter precincts and that there has been no proof that the population deviation of nineteen persons bore any relationship to the alleged partisanship of Act 1. Thus, Act 1 is not unconstitutional.