**STATE OF KANSAS ex rel., Robert T. STEPHAN, Attorney General, Plaintiff,**

v.

**Bill GRAVES, Secretary of State, Defendant,**

**Legislative Coordinating Council of the State of Kansas, Intervenor–Defendant.**

**No. 92–4097–R.**

United States District Court, D. Kansas.

June 24, 1992.

Robert T. Stephan, Atty. Gen., and Martha M. Snyder, Asst. Atty. Gen., Topeka, Kan., for plaintiff.

John R. Wine, Jr., Gen. Counsel, Office of Secretary of State, Topeka, Kan., for defendant Bill Graves, Secretary of State.

Norman J. Furse, Revisor of Statutes, Mary Ann Torrence and Robert J. Nugent, Asst. Revisors of Statutes, State of Kan., Topeka, Kan., for intervenor-defendant Legislative Coordinating Council of State of Kan.

Marvin Wm. Barkis, Speaker, Kansas House of Representatives, Louisburg, Kan., as amicus curiae.

Dan Biles of Gates & Clyde, Overland Park, Kan., for amicus curiae U.S. Congressman Jim Slattery.

Douglas F. Martin of Porter, Fairchild, Wachter & Haney, Topeka, Kan., for amicus curiae Donald N. Widrig.

Tino M. Monaldo, Hutchinson, Kan., filed an amicus curiae brief.

Ron Svaty, Ellsworth, Kan., filed an amicus curiae brief.

Before LOGAN, Circuit Judge, KELLY, Chief Judge, and ROGERS, District Judge.

LOGAN, Circuit Judge.

This case, before a three-judge panel convened pursuant to 28 U.S.C. § 2284(a), was filed by the Attorney General of the State of Kansas requesting declaratory and injunctive relief relating to the redistricting of Kansas congressional and state legislative districts for the 1992 elections.

The action was filed while the legislature was in extended session and it was not known whether it would reach agreement on boundaries for new congressional, state senate, state representative, and Kansas board of education districts required by demographic shifts documented by the 1990 decennial census. The new census figures resulted in Kansas losing one seat in the House of Representatives, decreasing the number of congressional districts in the state from five to four. After the filing and before the first hearing in this case, the legislature passed and the governor signed into law acts establishing new boundaries for all of the state and congressional districts. Pursuant to Kansas law the state legislative and board of education districts currently are under review by the Kansas Supreme Court. *See* Kan. Const. art. 10, § 1(b).

Plaintiff asks this court to stay action on the portions of the complaint relating to the state legislative and education board districts until the review by the Kansas Supreme Court is completed. Plaintiff's position is that the population and other

characteristics of the state redistricting expressed in those acts are within federal constitutional limits. The Attorney General requests no further action by this court unless the Kansas Supreme Court holds one or more of the redistricting acts to be unconstitutional. We grant the motion for stay of our consideration of those portions of the complaint; this opinion expresses no views on the legislative reapportionment acts relating to the state offices.

■ Plaintiff contends that the redistricting act, Senate Bill No. 767 (S.B.767), which established congressional districts with a maximum population deviation [1] of 0.94%, violates Art. 1, § 2 and the Fourteenth Amendment of the United States Constitution. Plaintiff asks us to so declare and to give injunctive relief against enforcement of the newly enacted congressional redistricting act, S.B. 767. The Attorney General asserts that because the legislature is no longer in session and the filing and primary election dates are too imminent to permit further legislative consideration, this court should determine the congressional districts under authority of 28 U.S.C. §§ 1331, 1357, 2201, 2202 and 2284. The Secretary of State agrees that the congressional districts as enacted exceed the population variances permitted by the United States Supreme Court cases; he requests the same relief as plaintiff, but urges that our decision issue on or before June 12, which will permit his office to accept candidate filings and conduct the elections at times established under Kansas law. The Legislative Coordinating Council of the State of Kansas has been permitted to intervene as a defendant to support the constitutionality of the congressional district lines as drawn by S.B. 767.

This court established a deadline for applications for intervention and for party and amicus briefs and documentary presentations. That deadline has now passed. The court has considered the briefs and documents presented, including a large number of redistricting plans put forward by various sources. After holding a second and final hearing to consider additional evidence and arguments, it now rules.

■ When, as here, the legislature has enacted and the governor has signed into law a redistricting plan, a federal court should defer to the plan if it is constitutionally acceptable, and, if unacceptable, intrude upon state policy no more than necessary. *See White v. Weiser*, 412 U.S. 783, 795, 93 S.Ct. 2348, 2354–55, 37 L.Ed.2d 335 (1973). Thus, deference to a decision made by the state legislative and executive branches in this area, which is so necessarily political, is an important linchpin of judicial review.

Nevertheless, the legislative plan must meet the constitutional standard. "[C]onstrued in its historical context, the command of Art. I, § 2, that Representatives be chosen 'by the People of the several States' means that *as nearly as is practicable* one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 530, 11 L.Ed.2d 481 (1964) (emphasis added) (footnote omitted). In *Wesberry* the Supreme Court went on to state:

> While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us.

*Id.* at 18, 84 S.Ct. at 535.

The Supreme Court refined this standard in *Kirkpatrick v. Preisler*, 394 U.S. 526, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969), in which the Court rejected the State of Missouri's argument "that there is a fixed numerical

---

1. "Maximum population deviation" is the difference in population between the largest and smallest districts divided by the "ideal district population." The "ideal district population" is equal to the total state population divided by the total number of districts.

or percentage population variance small enough to be considered *de minimis* and to satisfy without question the 'as nearly as practicable' standard." *Id.* at 530, 89 S.Ct. at 1228. The Court said that the "standard requires that the State make a good-faith effort to achieve *precise mathematical equality.*" *Id.* at 530–31, 89 S.Ct. at 1229 (emphasis added). Article I, § 2 of the Constitution "permits only the limited population variances which are unavoidable despite a good-faith effort to achieve absolute equality, or for which justification is shown." *Id.* at 531, 89 S.Ct. at 1229. In *Karcher v. Daggett,* 462 U.S. 725, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983), the Court "reaffirm[ed] that there are no *de minimis* population variations, which could practicably be avoided, but which nonetheless meet the standard of Art. I, § 2, without justification." *Id.* at 734, 103 S.Ct. at 2660.

*Karcher* struck down a plan with a maximum population deviation between the high and the low districts of 0.6984%, even though that plan had been adopted by the legislature and approved by the governor. The plan before us, of course, has a greater variation: 0.94%. *Karcher* says that if population differences among districts can

be reduced or eliminated altogether by "the simple device of transferring entire political subdivisions of known population between contiguous districts," *id.* at 739, 103 S.Ct. at 2663 (quoting *Kirkpatrick,* 394 U.S. at 532, 89 S.Ct. at 1230), then that should be done.[2]

In its discussion the *Karcher* Court stated that "[a]ny number of consistently applied legislative policies might justify *some variance,* including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." *Id.* 462 U.S. at 740, 103 S.Ct. at 2663 (emphasis added). In defending S.B. 767, intervenor-defendant, the Legislative Coordinating Council, argues that the legislature took "into account compactness, and contiguity; communities of interest; preservation of political subdivisions; preservation of minority voter strength; and the one-man-one-vote requirement." Answer of Intervenor at 4.[3] No one has argued in the instant case that S.B. 767 unlawfully dilutes minority voting strength or asserts any basis for finding it unconstitutional except for the population discrepancies between districts. Although

---

**2.** We recognize that *Karcher* was a 5–4 decision, that Justice White wrote for four dissenters who would approve a population variance greater than that in the act before us, and that four of the justices participating in *Karcher* (two in the majority and two dissenters) are no longer on the Court. Thus, conceivably a majority of the current Supreme Court might take the view of the original dissenters. But we lower court judges live in the present. We must regard *Karcher* as controlling, and we must apply the analysis dictated by that opinion.

**3.** The legislature adopted the following congressional redistricting guidelines to guide the negotiators who produced the plan ultimately enacted into law:

> 1. Districts are to be as nearly equal in population as practicable without the division of any county into two or more districts. It is to be the policy to preserve county boundaries. County lines are meaningful in Kansas and Kansas counties have historically been significant political units. Many officials are elected on a county-wide basis, and political parties have been organized in county units. Election of the Kansas members of Congress

is a political process requiring political organizations which in Kansas are developed in county units. To a considerable degree most counties in Kansas are economic, social, cultural, racial and ethnic units, or parts of a larger socio-economic unit. These interests common to the population of the area, generally termed "community of interests" should be considered without breaking county lines.
> 2. Districts should be as compact as possible and contiguous. If possible, preserving the core of the existing districts should be undertaken when considering the "community of interests" in establishing districts.
> 3. The basis for redistricting the members of Congress is the 1990 United States Decennial Census as published by the U.S. Department of Commerce, Bureau of the Census. The "building blocks" to be used for drawing district boundaries shall be the counties as their population is reported in the 1990 U.S. Decennial Census.
> 4. Districts should attempt to recognize "community of interests" when that can be done in compliance with the above guidelines.

Reply of State of Kansas, Ex. E; Brief of Intervenor Legislative Coordinating Council, Ex. A.

amicus briefs have argued for shifting county boundaries to preserve former alignments and alleged communities of interest, S.B. 767, which had bipartisan support, appears to meet the objectives listed by the Legislative Coordinating Council other than the population disparities.

In *O'Sullivan v. Brier,* 540 F.Supp. 1200 (D.Kan.1982), this court adopted a plan, which governed the congressional elections for the past ten years, that preserved county lines and had a maximum population deviation of 0.338% or 1598 people. *Id.* at 1205. We are convinced, however, that a population deviation of this size is too great to survive the Supreme Court's later formulation in *Karcher,* unless keeping counties wholly within a single district, as the legislature wished to do, is sufficient justification for the deviation. That is the key question before us, as we see it.

The United States Supreme Court has addressed whether population deviations among districts are justified by the integrity of county lines. In *Kirkpatrick,* the Court stated:

[W]e do not find legally acceptable the argument that variances are justified if they necessarily result from a State's attempt to avoid fragmenting political subdivisions by drawing congressional district lines along existing county, municipal, or other political subdivision boundaries. The State's interest in constructing congressional districts in this manner, it is suggested, is to minimize the opportunities for partisan gerrymandering. But an argument that deviations from equality are justified in order to inhibit legislators from engaging in partisan gerrymandering is no more than a variant of the argument, already rejected, that considerations of practical politics can justify population disparities.

*Id.* 394 U.S. at 533–34, 82 S.Ct. at 1230 (footnote omitted). In *White,* the Supreme Court quoted the statement from *Kirkpatrick* that population variations cannot be justified by drawing congressional district lines along existing county or other political subdivision boundaries, *see* 412 U.S. at 791, 93 S.Ct. at 2252–53, and held that the three-judge district court should have adopted the one of two plans it considered that was closest to that adopted by the state legislature, *see id.* at 796, 93 S.Ct. at 2355, and that had a slightly lower population deviation, even though it cut across eighteen more county lines than did the plan adopted by the legislature, *see id.* at 786, 93 S.Ct. at 2350; *see also Karcher,* 462 U.S. at 733 n. 5, 103 S.Ct. at 2659–60 n. 5 ("Preserving political subdivisions intact, however, while perfectly permissible as a secondary goal, is not a sufficient excuse for failing to achieve population equality without the specific showing described *infra* ...); *Wells v. Rockefeller,* 394 U.S. 542, 546, 89 S.Ct. 1234, 1237, 22 L.Ed.2d 535 (1969) ("Nor are the variations in the 'North country' districts justified by the fact that these districts are constructed of entire counties.").

■ Of the plans presented to us for consideration that preserve county lines only three have a maximum population deviation of less than 0.34%. Those plans are so at variance in configuration with the S.B. 767 plan ultimately adopted by the legislature that we rejected them.

■ One plan presented to us achieved almost perfect population equality among districts by following the configuration of S.B. 767 except for cutting county lines in two places: (1) leaving three Douglas County townships, formerly in the second district, in that district instead of placing them with the rest of Douglas County in the third district, and (2) placing one township in Marion County, for many years in the fourth district but recently in the fifth district, in the fourth district instead of placing it with the rest of Marion County in the first district. With these slight changes the maximum population deviation is reduced to 0.01%. This plan has the following characteristics:

.

| "District Name | Number Members | Total Population | Ideal Population | District Variance | % District Variance |
|---|---|---|---|---|---|
| District 1 | 1 | 619,370 | 619,394 | −24 | 0.00% |
| District 2 | 1 | 619,391 | 619,394 | − 3 | 0.00% |
| District 3 | 1 | 619,439 | 619,394 | 45 | 0.01% |
| District 4 | 1 | 619,874 | 619,394 | −20 | 0.00% |
| Total | 4 | 2,477,574 | 2,477,576 | − 2 | 0.00% |

Planwide Statistics:

| | |
|---|---|
| Range of populations: | 619,370 to 619,439 |
| Ratio range: | 1.0001 |
| Absolute range: | −24 to 45 |
| Absolute overall range: | 69 |
| Relative range: | 0.00 to 0.01% |
| Relative overall range: | 0.01%" |

---

Reply of State of Kansas, Ex. A.6 at 2.

We have been assured by counsel for the Secretary of State that adopting the congressional district boundaries set forth in this plan would not pose major problems in the conduct of the primary or general elections. The plan was put forward by the Republican leadership after passage of S.B. 767 and is supported by amicus Democratic Congressman Jim Slattery. The plan honors the lines drawn in S.B. 767, as passed by the legislature and signed into law by the governor, except for moving four townships. Adoption of this plan would come the closest possible to deferring to the legislative will and intruding upon state policy as little as possible, emphasized as our duty in *White, see* 412 U.S. at 794–96, 93 S.Ct. at 2354, while meeting the constitutional standard enunciated in the Supreme Court cases.

We find the plan set out in S.B. 767 unconstitutional on the basis that the device of "transferring entire political subdivisions of known population between contiguous districts would ... produce[] districts much closer to numerical equality." *Karcher,* 462 U.S. at 739, 103 S.Ct. at 2663 (quoting *Kirkpatrick,* 394 U.S. at 532, 89 S.Ct. at 1229). We enjoin the conduct of any primary or general election based upon the districts established in S.B. 767. Because of the lack of time for additional legislative consideration, we adopt, in lieu of the districts set forth in S.B. 767, those presented to us as Ex. A.6, set forth in appendix A hereto, which configuration has an absolute overall range variation of only 69 persons, and a deviation from perfect population equality of only 0.01%. We order that these be the districts utilized in the 1992 elections and until altered by a duly enacted law meeting constitutional standards.

IT IS SO ORDERED.

## APPENDIX A

The following counties, or parts of counties identified, shall comprise the congressional election districts indicated:

First District: Barber, Barton, Chase, Cheyenne, Clark, Clay, Cloud, Comanche, Decatur, Dickinson, Edwards, Ellis, Ellsworth, Finney, Ford, Gove, Graham, Grant, Gray, Greeley, Hamilton, Haskell, Hodgeman, Jewell, Kearny, Kiowa, Lane, Lincoln, Logan, Lyon, McPherson, Marion [except Peabody township], Marshall, Meade, Mitchell, Morris, Morton, Ness, Norton, Osborne, Ottawa, Pawnee, Phillips, Pratt, Rawlins, Reno, Republic, Rice, Rooks, Rush, Russell, Saline, Scott, Seward, Sheridan, Sherman, Smith, Stafford, Stanton, Stevens, Thomas, Trego, Wabaunsee, Wallace, Washington, Wichita.

Second District: Allen, Anderson, Atchison, Bourbon, Brown, Cherokee, Coffey, Crawford, Doniphan, Franklin, Geary, Jackson, Jefferson, Labette, Leavenworth,

Linn, Nemaha, Neosho, Osage, Pottawatomie, Riley, Shawnee, Wilson, Woodson, and Lecompton, Kanwaka, and Clinton townships in Douglas.

Third District: Douglas [except Lecompton, Kanwaka, and Clinton townships], Johnson, Miami, Wyandotte.

Fourth District: Butler, Chautauqua, Cowley, Elk, Greenwood, Harper, Harvey, Kingman, Montgomery, Sedgwick, Sumner, and Peabody township in Marion.