Timothy GRAHAM, Plaintiff,

v.

Ron THORNBURGH, in his official capacity as Secretary of State of the State of Kansas, Defendant,

and

Iowa Tribe of Kansas and Nebraska; Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas; Prairie Band Potawatomi Nation; and Sac and Fox Nation of Missouri in Kansas and Nebraska, Intervenors,

Michael R. O'NEAL, Intervenor,

Susan ESTES, Intervenor,

Robert C. MUNSON, John G. Montgomery, Alexander John Sajo, Jane L. Sajo, and Bobby Whitten, Intervenors.

No. 02–4087–JAR.

United States District Court, D. Kansas.

July 3, 2002.

William Scott Hesse, Scott B. Poor, Office of Attorney General, Carla J. Stovall, Kansas Attorney General, Topeka, KS, for State of Kansas ex rel. Carla J. Stovall, Attorney General, plaintiffs.

Richard F. Hayse, Morris, Laing, Evans, Brock & Kennedy, Chtd., Topeka, KS, for Ron Thornburgh, in his official capacity as Secretary of State of the State of Kansas, defendants.

Robert V. Eye, Irigonegaray & Associates, Topeka, KS, for Timothy Graham.

Mark S. Gunnison, Payne & Jones, Chtd., Overland Park, KS, for Iowa Tribe of Kansas & Nebraska.

Charley L. Laman, Topeka, KS, for Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas.

David Prager, III, Mayetta, KS, for Prairie Band Potawatomi Nation.

Thomas Weathers, Alexander & Karshmer, Berkeley, CA, for Sac and Fox Nation of Missouri.

Michael R. O'Neal, Gilliland & Hayes, P.A., Hutchinson, KS, for Michael R. O'Neal.

Richard A. Macias, Wichita, KS, for Susan Estes.

Before TACHA, Chief Circuit Judge, MARTEN, and ROBINSON, District Judges.

PER CURIAM.

The members of the U.S. House of Representatives are chosen "by the People of the several States." U.S. Const. art. I, § 2, cl. 1. "The Times, Places and Manner of holding Elections for Senators and Representatives shall be prescribed in each State by the Legislature thereof ...." U.S. Const. art. I, § 4, cl. 1. The Kansas Legislature has redrawn the congressional districts for the State of Kansas. The only question before this court is whether these district lines comply with the mandates of the federal Constitution.

Plaintiff Timothy Graham, along with intervening residents of Junction City, Kansas, argue that the redistricting plan recently enacted by the Kansas Legislature is unconstitutional because it violates the one-person, one-vote requirement of Article I, Section 2 of the U.S. Constitution. Having carefully examined the legislature's adopted plan, the parties' proposed redistricting plans, and the evidence that the parties have presented, we conclude that the state legislature's plan satisfies the mandate of Article I, Section 2.

## I. Background

### A. Procedural History

On June 5, 2002, the Attorney General of the State of Kansas brought the present action seeking a declaration that the current plan for apportionment of the United States congressional districts within the State is unconstitutional. The claim is brought pursuant to Article 1, Section 2 of the United States Constitution, and invokes the general federal question jurisdiction of the court, 28 U.S.C. § 1331, as well as 28 U.S.C. § 1357, which provides for original jurisdiction in civil actions to enforce the right of citizens to vote. A three-judge panel was convened pursuant to 28 U.S.C. § 2284(a).

The Attorney General's complaint seeks a declaration that the existing apportionment is invalid pursuant to 28 U.S.C. §§ 2201 and 2202. In addition, the complaint requests an injunction prohibiting the defendant, the Kansas Secretary of State, from conducting the 2002 primary and general elections based upon the existing districting plan. The Attorney General has submitted an alternative plan which she urges the court to adopt.

Timothy Graham, who has filed a motion to intervene, also challenges the current plan. Michael R. O'Neal, Susan Estes, and several Kansas Indian Tribes and Nations have also filed motions to intervene. On June 18, the court provisionally granted the prospective intervenors leave to intervene. Each of the prospective intervenors, except the Tribes, has submitted an alternate redistricting map to the court.

On June 14, the court adopted a briefing schedule and required stipulations of fact by June 18. The court scheduled a hearing on the various challenges on July 2, 2002, and the court extended the deadline for candidate filings for the U.S. House of Representatives to July 9, 2002. On June 19, the court granted a motion by the defendant seeking to extend additional election deadlines. The deadline for county election officers to mail federal absentee ballots to applicants was extended to July 12, 2002, and the deadline for advance

voting ballots was extended to July 24, 2002.

The parties filed Joint Stipulations of Fact on June 20. The Attorney General filed a Motion for Summary Judgment on June 24. The other parties have responded to this motion. In addition, intervenor O'Neal has moved to strike certain affidavits filed in support of the plaintiff's motion. At the hearing on July 2, the court denied the motion for summary judgment and the motion to strike.

### B. Standing

 Carla J. Stovall is the duly elected, acting and qualified Attorney General of the State of Kansas. Defendant Ron Thornburgh is the duly elected, acting and qualified Secretary of State of the State of Kansas. He is the chief elections officer of the state. The Secretary of State challenges the standing of the Attorney General to bring this action. To bring a voting rights claim, a plaintiff must allege a specific and personal injury as a voter. *Baker v. Carr*, 369 U.S. 186, 204–08, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). The Attorney General's complaint asserts that the separation of Fort Riley and Junction City has caused the voters of that area such injury. A state, however, does not generally have standing simply by asserting the rights of particular citizens, because "[i]nterests of private parties are obviously not in themselves sovereign interests, and they do not become such simply by virtue of the State's aiding in their achievement." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 600–02, 102 S.Ct. 3260, 73 L.Ed.2d 995 (1982). A state may, in some situations, pursue a *parens patriae* action when it can assert a "quasi-sovereign" interest that is "more . . . than injury to an identifiable group of individual residents." *Id.* at 607, 102 S.Ct. 3260. "Quasi-sovereign" interests have been shown where a state has sought to protect the health and well-being of its residents

in general or where a state claims an interest in not being denied its status within the federal system. *Id.* The State of Kansas asserts no such interest in this case. We find it unnecessary to examine the Kansas statute on which the Attorney General purports to rely for standing. Standing is a question of *federal* law, *Baker*, 369 U.S. at 204, 82 S.Ct. 691, and state law cannot create federal standing that does not otherwise exist. For these reasons, we hold that the State of Kansas lacks standing, and we dismiss from this action the Attorney General as a representative of the State.

 Timothy Graham, a registered voter and resident of Lawrence, Kansas, has alleged direct injury as a result of the redistricting plan adopted by the Kansas Legislature. Graham moved to intervene and is an intervenor of right under Fed. R.Civ.P. 24(a). Graham clearly has federal question standing and is proceeding by duly authorized private counsel. The defendant specifically requested that the court substitute Graham as plaintiff in this action, and Graham consented to the substitution at the hearing. Although Graham was allotted less time for argument based on his original status as an intervenor rather than as a plaintiff, he did not request additional time or express any concern that he would suffer any prejudice from being substituted as plaintiff. The defendant's request for and Graham's consent to the substitution are hereby construed as a motion for substitution of parties. The motion is granted. Intervenors of right are treated as original parties. *Alvarado v. J.C. Penney Co.*, 997 F.2d 803, 805 (10th Cir.1993). Thus, there is no practical difference between a substituted plaintiff and an intervenor of right in this litigation.

Rule 21 of the Federal Rules of Civil Procedure provides that "[p]arties may be

dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms are just." This rule empowers courts to add or substitute parties at various stages of litigation. *Mullaney v. Anderson,* 342 U.S. 415, 417, 72 S.Ct. 428, 96 L.Ed. 458 (1952) (noting that "Rule 21 will rarely come into play at this stage of a litigation" but granting petitioner's motion to add parties on the grounds that "[t]o dismiss the present petition and require the new plaintiffs to start over in the District Court would entail needless waste"); *see also Newman–Green, Inc. v. Alfonzo–Larrain,* 490 U.S. 826, 836–37, 109 S.Ct. 2218, 104 L.Ed.2d 893 (1989) ("Appellate-level amendments to correct jurisdictional defects may not be the most intellectually satisfying approach to the spoiler problem, but ... because law is an instrument of governance rather than a hymn to intellectual beauty, some consideration must be given to practicalities."). Courts in other circumstances have taken the step of *sua sponte* substituting defendants when prejudice to the parties would not result, and when doing so would cure a jurisdictional defect. *Sims v. Florida,* 862 F.2d 1449, 1460 (11th Cir.1989) (avoiding Eleventh Amendment issues by substituting the Director of the Division of Motor Vehicles for the State when there was a "lack of prejudice to the state and its officials"); *id.* at 1461 (noting that the substitution was *sua sponte* ) (Tjoflat, J., dissenting); *Dawes v. United States,* 1985 WL 84, at *1 n. 1 (D.Kan.1985) (*sua sponte* substituting the United States as a defendant when plaintiffs improperly named other defendants).

Here, there is no prejudice to the parties, as the substitution was requested by the defendant and the substituted plaintiff consented to it. In addition, it would "entail needless waste" to dismiss the case at this stage in the litigation, *Mullaney,* 342 U.S. at 417, 72 S.Ct. 428, as the issues

raised are common in law and in fact, and all parties have thoroughly briefed the issues. Finally, it is simply not feasible to require plaintiffs to start over if Kansas is to avoid delaying its primary election.

The Attorney General has also filed a motion to amend her complaint to add individual plaintiffs who reside in Junction City, Kansas. The Assistant Attorney General proceeded to argue on behalf of these individuals at the hearing. The Secretary of State challenges the authority of the Attorney General under state law to represent private parties in this action. Because of the serious state law questions raised regarding the Attorney General's authority to proceed on behalf of the Junction City individuals and her authority to file the amended complaint, we construe the motion to amend the complaint as a motion to intervene by the Junction City individuals. We note that the Attorney General was proceeding in good faith, relying on this court's decision in *Kansas ex rel. Stephan v. Graves,* 796 F.Supp. 468 (D.Kan.1992), in which the parties were identical to the original parties in this action: the Attorney General as plaintiff and the Secretary of State as defendant. The standing and authority of the Attorney General were not raised in that case. Thus, the posture of the parties in that case is not precedential. Federal question standing and the authority of the Attorney General are squarely raised in this case.

Although the arguments challenging the authority of the Attorney General raise a serious question of state law, we decline to reach this issue, and for purposes of this matter alone, exercise our discretion to authorize the Assistant Attorney General to represent the interests of the Junction City individuals. These individuals consented to have their names included as plaintiffs on the motion to amend the complaint. We therefore assume that they

consent to be represented in this matter by the Assistant Attorney General. We expressly emphasize that the permission granted to the Assistant Attorney General under these circumstances is limited to this case and cannot be cited as precedent for any such representation in the future.

### C. Intervenors

Timothy Graham is a registered voter and a resident of Lawrence, Douglas County, Kansas. The court has granted Graham's motion to intervene as a matter of right, Fed.R.Civ.P. 24(a), and has substituted him as plaintiff in this action.

Intervenors Iowa Tribe of Kansas and Nebraska; Kickapoo Tribe of Indians of the Kickapoo Reservation in Kansas; Prairie Band Potawatomi Nation; and Sac and Fox Nation of Missouri in Kansas and Nebraska are here collectively referred to as the Tribes. The Tribes are federally recognized Native American Indian Tribes with all or part of their reservations and their administrative offices located in Northeast Kansas. Each appears on its own behalf and on behalf of its respective members. The Tribes have complete civil jurisdiction over their Tribes and territories except as limited by Treaties with the United States of America or by specific legislation of the U.S. Congress. The Native Americans who live on the Kickapoo, Iowa, Potawatomi, and Sac and Fox reservations are a racial minority. We hereby grant permission to the Tribes to intervene. Fed.R.Civ.P. 24(b).

Intervenor Susan Estes is a registered voter and an individual resident of Wichita, Sedgwick County, Kansas. We hereby grant permission to Estes to intervene. Fed.R.Civ.P. 24(b).

Intervenor Michael R. O'Neal is a Kansas State Legislator and Chairman of the House Redistricting Committee. He is a resident of Hutchinson, Reno County, Kansas. Representative O'Neal has not been retained by the Legislative Coordinating Council (which represents the Kansas Legislature when it is not in session) for the purposes of representing the legislature in this action. He appears here "on behalf of himself as a legislator and as Chairman of the House Redistricting Committee." We hereby grant permission to O'Neal to intervene. Fed.R.Civ.P. 24(b).

Robert C. Munson, John G. Montgomery, Alexander John Sajo, Jane L. Sajo, and Bobby Whitten are residents of Junction City, Kansas. They are all registered voters. They allege direct injury as a result of the redistricting plan adopted by the legislature. We have designated the Junction City individuals intervenors of right. Fed.R.Civ.P. 24(a).

### D. The Legislative Process

In April, 2000, the United States Government conducted its decennial census as required by law. All parties to this litigation have relied on information obtained from that census. As a result of the census. Congress has issued a certificate of entitlement to the Kansas Secretary of State stating that Kansas is entitled to four congressional districts in the 2002 elections.

By dividing the population as determined by the 2000 census into four congressional districts, the average congressional district would contain 672,104.5 persons. Depending on which way that number is rounded, the "ideal" Kansas congressional district would contain either 672,104 or 672,105 persons. All parties have adopted 672,105 as the ideal standard. Because of the substantial population shifts which are reflected in the 2000 decennial census, the existing Kansas congressional districts (as set forth in K.S.A. §§ 4–128, 4–133, and 4–135) are no longer constitutional. Recognizing that Kansas congressional districts had to be redrawn

for the 2002 primary and general elections, the 2001 Kansas Legislature began the redistricting process.

The Kansas Legislature created the Special Committee on Redistricting, which was charged with developing for consideration by the 2002 Legislature congressional, legislative, and State Board of Education redistricting plans based upon the 2000 Census of Population. The Special Committee met several times between the 2001 and 2002 sessions. The Special Committee considered 29 separate plans for new congressional districts. The findings and recommendations of the Special Committee were documented and presented to the legislature in the Committee Report to the 2002 Legislature.

In evaluating potential plans, the House Select Committee on Redistricting and the Senate Committee on Reapportionment adopted "Guidelines and Criteria for 2002 Kansas Congressional and Legislative Redistricting" ("Guidelines"). For the reapportionment of congressional districts, the legislature adopted the following criteria:

1. The basis for congressional redistricting is the 2000 U.S. Decennial Census as published by the U.S. Department of Commerce, Bureau of the Census. The "building blocks" to be used for drawing district boundaries shall be Kansas counties and voting districts (VTDs) as their population is reported in the 2000 U.S. Decennial Census.

2. Districts are to be as nearly equal to 672,105 population as practicable.

3. Redistricting plans will have neither the purpose nor the effect of diluting minority voting strength.

4. Districts should attempt to recognize "community of interests" when that can be done in compliance with the requirement of guideline No. 2.
 a. Social, cultural, racial, ethnic, and economic interests common to the population of the area, which are probable subjects of legislation (generally termed "communities of interest"), should be considered.
 b. If possible, preserving the core of the existing districts should be undertaken when considering the "community of interests" in establishing districts.
 c. Whole counties should be in the same congressional district to the extent possible while achieving population equality among districts. County lines are meaningful in Kansas and Kansas counties have historically been significant political units. Many officials are elected on a countywide basis, and political parties have been organized in county units. Election of the Kansas members of Congress is a political process requiring political organizations which in Kansas are developed in county units. To a considerable degree most counties in Kansas are economic, social, and cultural units, or parts of a larger socioeconomic unit. These interests common to the population of the area, generally termed "community of interests" should be considered during the creation of congressional districts.

5. Districts should be as compact as possible and contiguous, subject to the requirement of guideline No. 2.

The Kansas Legislative Research Department of the Kansas Legislative Branch (KLRD) performed an analysis of the 29 plans considered by the Special Committee, along with nearly fifty other plans, for compliance with the Guidelines.

The Republican Caucus of the Special Committee adopted certain priorities, including that Fort Riley and Fort Leavenworth should remain in the Second Dis-

trict, and that Riley, Pottawattomie, and Geary Counties should remain in the same district as the two forts. The Democrat Caucus adopted the priority that the counties of Riley, Pottawattomie, and Geary Counties constitute a community of interest that should be recognized and retained.

The plan recommended by the Special Committee on Redistricting was rejected by the legislature. The Special Committee's plan—like the plan ultimately adopted by the legislature—split Fort Riley from the rest of Geary County. Further, the Special Committee's recommended plan had a maximum deviation of 132 persons,[1] a figure substantially greater than that for the adopted plan.

The congressional redistricting plan that ultimately passed was set forth in House Substitute for Senate Bill 152 ("H. Sub. S.B. 152" or "the adopted plan") and is also known as the Iowa–JC–GW–NE plan. Senate Bill 152, which originally dealt with an unrelated matter but eventually became the vehicle by which the Iowa–JC–GW–NE plan became law, was passed by the Senate Committee on Federal and State Affairs on March 19, 2001. Senate Bill 152 was amended by the Senate Committee of the Whole on March 22, 2001, and referred to the House Committee on Federal and State Affairs on March 27, 2001. The bill was then inactive for more than one year. On May 11, 2002, the 101st day of the 2002 Legislative Session, the House Committee on Federal and State Affairs altered the subject matter of Senate Bill 152 by deleting its original content and inserting provisions for congressional redistricting (a plan called HR Congress 4).

The parties dispute the treatment of HR Congress 4 in the House. According to an affidavit of Senator Lana Oleen, HR Congress 4 had been the subject of prior hearings before the Special Committee, but

when the matter was taken up by the House sitting as a Committee of the Whole on May 14, 2002, only two amendments were allowed. The second, by State Representative (and intervenor) O'Neal, was the Iowa–JC–GW–NE plan. This plan, which did not have the benefit of prior hearings before the Special Committee, was submitted for statistical review on May 13 and offered as an amendment the next day.

O'Neal challenges this version of events. According to him, there was no limitation on the number of potential amendments. The first amendment, offered by Representative Levinson of Junction City, would have kept Fort Riley and the rest of Geary County together. This amendment was rejected. Further, while Iowa–JC–GW–NE was not specifically presented to the Special Committee, the general proposals to split Fort Riley from the rest of Geary County and to divide the City of Lawrence were not only considered by the Special Committee, they were part of the plan recommended by the Special Committee.

The House Committee of the Whole voted 78 to 45 for the passage of House Substitute for Senate Bill 152. On May 15, 2002, a motion to concur failed in the Senate 16 to 20. A motion to non-concur was passed, and a conference committee was appointed. The next day, the last of the 2002 Legislative Session, another motion to concur was made and passed with a vote of 22 to 17.

The Junction City intervenors submit, through affidavits by State Senators Oleen and Ruth Teichman, that House Substitute for Senate Bill 152 lacked timely discussion and debate prior to passage. Intervenor O'Neal controverts this contention, stating that the legislation was debated on

---

**1.** The "maximum deviation" is the difference between the largest and the smallest districts.

the House floor and was the subject of two floor debates in the Senate.

On May 22, 2002, House Substitute for Senate Bill 152 was enrolled and presented to the Governor. The Governor signed House Substitute for Senate Bill 152 on May 31, 2002.

### E. Fort Riley and Junction City

Junction City, Kansas, is located in Geary County, Kansas. Fort Riley, Kansas is located in both Riley County and Geary County, Kansas. Unified School District 475 ("U.S.D. 475") serves both Fort Riley and Junction City students. Approximately 60% of the 6,300 students in U.S.D. 475 are directly connected with Fort Riley. Nearly 50% of the students have a parent or guardian on active duty at Fort Riley. Another 11% of the students come from homes of civilians employed at Fort Riley. Approximately 40% of the students live on the military post.

U.S.D. 475 was the first public school district to take ownership of school buildings on federal property. The five elementary schools and one middle school located on the Fort Riley Military Reservation are owned by U.S.D. 475. The Fort Leavenworth Unified School District and U.S.D. 475 are eligible for federal impact aid for school districts serving military populations under Section 8003, Title VIII of the Elementary and Secondary Education Act. Last year, Kansas received over $10.7 million in federal impact aid. The State of Kansas is projected to receive $18,499,573 in Title VII–Impact Aid for Fiscal Year 2002.

Based upon the foregoing facts, along with the affidavits of Superintendent Mary Devin of U.S.D. 475 and State Senator Lana Oleen, the Junction City intervenors contend that Fort Riley and Junction City, Kansas, constitute a community of inter-

est. The defendant agrees there is an "unquestionably close relationship between U.S.D. 475 and Fort Riley," but contends that this relationship was one of many factors considered by the legislature in choosing a redistricting plan.

The Junction City intervenors further cite Superintendent Devin's statement that her school district works closely with the Second Congressional District Representative and staff in obtaining federal impact aid. Devin avers that separating Junction City from Fort Riley will produce duplication of efforts in her office and in Kansas congressional offices and will dilute the effectiveness of officials in obtaining impact aid. The defendant and intervenor O'Neal argue that the cited evidence fails to effectively support the claimed dilution.

The Junction City intervenors contend, based upon the affidavits of State Senators Oleen, Teichman, and David Haley, that Geary County, Kansas, has a significant minority population, which is diluted by the separation of Junction City from Fort Riley. They contend that the total annual payroll of Fort Riley is $497,441,262. Local companies contract services to Fort Riley annually in the amount of $43,373,385. Additionally, local construction contracts at Fort Riley are valued at $49,189,394 for the current year. Both defendant and intervenor O'Neal controvert these contentions, arguing that they are conclusory and not founded on personal knowledge.

### F. Plan Comparison

The characteristics of the reapportionment plan adopted by the Kansas Legislature, the plan submitted by the plaintiff, and the plans of three of the four intervening parties[2] are set forth in Table 1. Information contained in the table is taken from

---

**2.** The Tribes have not submitted any specific reapportionment plan.

KLRD analysis of the various proposed redistricting plans submitted as part of the Joint Stipulations of Fact.

## Table 1

### Plan Comparison

| | Legislature | Atty. Gen. | Graham | O'Neal | Estes |
|---|---|---|---|---|---|
| Variation from Ideal— | | | | | |
| District 1 | − 14 | − 10 | 0 | 0 | − 1 |
| District 2 | − 3 | − 7 | 0 | − 1 | 0 |
| District 3 | + 19 | + 19 | − 1 | − 1 | 0 |
| District 4 | − 4 | − 4 | − 1 | 0 | − 1 |
| Split— | | | | | |
| Counties | 4 | 3 | 4 | 3 | 4 |
| VTDs | 1 | 1 | 3 | 3 | 4 |
| School Dist. | 50 | 55 | 53 | 45 | 50 |
| Lawrence | yes | yes | no | yes | yes |
| F. Riley–Junction C. | yes | no | no | no | yes |
| Johnson County | no | no | yes | no | no |
| Roeck Range [3] | 0.38 − | 0.34 − | 0.35 − | 0.34 − | 0.38 − |
| | 0.51 | 0.51 | 0.49 | 0.57 | 0.50 |
| Roeck Mean | 0.45 | 0.44 | 0.43 | 0.47 | 0.44 |

As reapportioned by the 2002 Kansas Legislature, the total population spread between the most populous and least populous of the four congressional districts is 33 persons or 0.0049% of the ideal of 672,105. The adopted plan divides four Kansas counties between congressional districts: Geary, Nemaha, Greenwood, and Douglas. The plan divides Geary County, Kansas, between the First District and the Second District, placing Junction City in the First District and Fort Riley in the Second District. In addition, the adopted plan divides the City of Lawrence between the Second and Third Districts, placing the East campus of the University of Kansas in the Third District and West campus in the Second District. The plan also divides one voting district and 50 school districts between congressional districts, including U.S.D. 475 in Geary County and U.S.D. 497 in Douglas County.

The 1992 reapportionment placed Junction City and Fort Riley Military Reservation in the same district, the Second Congressional District. It also placed the City of Lawrence entirely in the Third Congressional District.

The Junction City intervenors propose a different redistricting plan designated as the Attorney General's plan in Table 1, under which the total population spread between the most populous and least populous of the four congressional districts

3. The Roeck measure is an area-based measure that compares each district to a circle (the most compact possible shape). The Roeck test computes the ratio of the area of the district to the area of the smallest circle which would enclose the district. The measure falls between 1 and 0. A 1 indicates the greatest possible level of compactness; a 0 the least. See Roeck, Ernest C., Jr., "Measuring Compactness as a Requirement of Legislative Apportionment," *Midwest J. of Pol. Sci.*, (February 1961): 70–74.

would be 29 persons or 0.0043% of the ideal of 672,105. This plan divides three counties between districts: Greenwood, Nemaha, and Douglas. The plan would not result in a division between Fort Riley and Junction City, but it would divide the City of Lawrence between the Second and Third Districts, placing the University of Kansas East Campus in the Third District and West Campus in the Second District. The plan would result in dividing one voting district and 55 school districts between congressional districts, including U.S.D. 497 in Douglas County; two school districts would each be split among three congressional districts.

Plaintiff Graham has proposed a different redistricting plan in an amended motion. Under his proposal, the total population spread between the most populous and least populous of the four congressional districts would be one, the least population deviation that is mathematically possible. This plan would divide four counties between congressional districts: Nemaha, Kingman, Douglas, and Johnson. The plan would not result in a division between Fort Riley and Junction City, nor within the City of Lawrence. It would result in dividing 53 school districts between congressional districts, not including U.S.D. 475 in Geary County, but including U.S.D. 497 in Douglas County; two school districts would be split among three congressional districts. The plan would divide three voting districts.

Intervenor Estes asserts that H. Sub. S.B. 152 is constitutional, but if determined by this court to be unconstitutional, she proposes an alternate redistricting plan. Under her plan, the total population spread between the most populous and least populous districts would be one, the least population deviation that is mathe-

matically possible. Estes's proposal would divide four counties between congressional districts: Greenwood, Nemaha, Douglas, and Geary. The plan also would separate Fort Riley from Junction City and would divide the City of Lawrence between the Second and Third Districts, placing the University of Kansas East campus in the Third District and West campus in the Second District. The plan would result in dividing four voting districts and 50 school districts between congressional districts; one school district would be split among three congressional districts. Defendant also asserts that if the court determines that H. Sub. S.B. 152 is unconstitutional, the court should adopt the Estes plan.

Intervenor O'Neal also asserts that H. Sub. S.B. 152 is constitutional, but if determined by this court to be unconstitutional, he proposes a different redistricting plan.[4] Under this plan the total population spread between the most populous and least populous districts would be one, the least population deviation that is mathematically possible. The redistricting proposed by intervenor O'Neal would divide three counties between congressional districts: Kingman, Washington, and Douglas. The plan would place Fort Riley and Junction City together in the First District. It would divide the City of Lawrence between the Second and Third Districts, placing the University of Kansas East campus in the Third District and West campus in the Second District. The plan would result in dividing three voting districts and 45 school districts between congressional districts.

The 1992 reapportionment and all plans before this court place the Iowa, Kickapoo, Potawatomi, and Sac and Fox reservations in the Second District.

---

4. At the hearing, however, O'Neal expressed a preference for the Estes plan as the one most closely approximating the will of the legisla-

ture, if the court determines that the adopted plan is unconstitutional.

## II. Discussion

■ The Constitution provides that the House of Representatives shall consist of members chosen "by the People of the several States." U.S. Const. art. I, § 2, cl. 1. The Supreme Court has interpreted Article I, Section 2 to mean that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry v. Sanders*, 376 U.S. 1, 7–8, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964). The "as nearly as is practicable" standard represents the primary objective that must guide state legislatures' congressional redistricting efforts:

> While it may not be possible to draw congressional districts with mathematical precision, that is no excuse for ignoring our Constitution's plain objective of making equal representation for equal numbers of people the fundamental goal for the House of Representatives. That is the high standard of justice and common sense which the Founders set for us.

*Id.* at 18, 84 S.Ct. 526. While this objective is paramount, however, the Constitution does not always require that population deviations among districts be as small as is mathematically possible. Rather, "the 'as nearly as practicable' standard requires that the State make a good-faith effort to achieve precise mathematical equality.... Unless population variances among congressional districts are shown to have resulted despite such effort, the State must justify each variance, no matter how small." *Kirkpatrick v. Preisler*, 394 U.S. 526, 530–31, 89 S.Ct. 1225, 22 L.Ed.2d 519 (1969) (citation omitted). The Court has held that there is no *de minimis* exception to this requirement. *Karcher v. Daggett*, 462 U.S. 725, 734, 103 S.Ct. 2653, 77 L.Ed.2d 133 (1983); *Kirkpatrick*, 394 U.S. at 531, 89 S.Ct. 1225.

■ Analysis of an Article I, Section 2 claim proceeds in two steps. First, the plaintiff bears the burden of proving that "the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." *Karcher*, 462 U.S. at 730–31, 103 S.Ct. 2653. If the plaintiff fails to show that the population differences were avoidable, then the constitutional challenge fails. *Id.* at 731, 103 S.Ct. 2653. If the plaintiff makes the required showing, however, then the burden shifts to the defendant to prove "that each significant variance between districts was necessary to achieve some legitimate goal." *Id.*

### A. Step 1—The Plaintiff's Burden

■ Under *Karcher*, the plaintiff has the burden of proof on the threshold question, which is "whether the population differences among districts could have been reduced or eliminated altogether by a good-faith effort to draw districts of equal population." 462 U.S. at 730, 103 S.Ct. 2653. It is clear from the Stipulated Facts that the legislature had before it plans with smaller population deviations, and the court has been presented with 3 plans that achieve the maximum equality mathematically possible, a deviation of just 1 person. Thus, a population deviation of 33 persons was avoidable.

Arguably, however, *Karcher* also requires the plaintiff to show that the legislature did not adopt the plan in good faith: "If ... the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality," then the court moves on to step 2. *Id.* at 731, 103 S.Ct. 2653. *Cf. Vieth v. Pennsylvania*, 195 F.Supp.2d 672, 674–76 (M.D.Pa. 2002) (holding that plaintiffs had met their burden by showing avoidability, but going on to hold that there was not a good-faith effort to achieve maximum equality).[5] In

---

5. We note, however, that it is unclear how the

*Vieth* court would have proceeded if it had

addition, the *Karcher* Court stated in a footnote, "[N]or do we indicate that a plan cannot represent a good-faith effort whenever a court can conceive of minor improvements." 462 U.S. at 739 n. 10, 103 S.Ct. 2653. We are cognizant, however, of the Supreme Court's instruction that there is no *de minimis* exception and that even small deviations must have legitimate justifications. Justifications, though, are the subject of inquiry in step 2, not step 1. We therefore find that the plaintiff has satisfied step 1 by showing that a deviation of 33 persons was avoidable.[6] This conclusion is consistent with the approaches of most other courts. *Stone v. Hechler,* 782 F.Supp. 1116, 1125 (N.D.W.Va.1992); *Anne Arundel County Republican Central Comm. v. State Admin. Bd. of Election Laws,* 781 F.Supp. 394, 396 (D.Md.1991); *Hastert v. State Bd. of Elections,* 777 F.Supp. 634, 644 (N.D.Ill.1991).

## B. *Step 2—The Defendant's Burden*

Once the plaintiff has satisfied its burden at step 1, the defendant has the burden of proving that the deviations are justified. *Karcher* provides the following instruction on application of the second step of the analysis:

[W]e are willing to defer to state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts.... Any number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives. As long as the criteria are nondiscriminatory, ... these are all legitimate objectives that on a proper showing could justify minor population deviations.

462 U.S. at 740, 103 S.Ct. 2653. The inquiry is flexible and fact-intensive:

The showing required to justify population deviations is flexible, depending on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely. By necessity, whether deviations are justified requires case-by-case attention to these factors.

*Id.* at 741, 103 S.Ct. 2653.

Under the Kansas Legislature's plan, there is a difference of 33 persons between the largest and the smallest districts. This is a maximum deviation of 0.0049 % (33/672,105). Our task is to determine whether this deviation is demonstrably justified by the legislature's consideration and application of the legitimate factors in its Congressional Redistricting Guidelines. We therefore consider the adopted plan in

not found that the evidence clearly showed a lack of good faith.

**6.** We also acknowledge that there is language in *Karcher* that arguably suggests that only "significant" variations must be justified: "If ... the plaintiffs can establish that the population differences were not the result of a good-faith effort to achieve equality, the State must bear the burden of proving that each *significant* variance between districts was necessary to achieve some legitimate goal." *Id.* at 731 (emphasis added) (cited in *Anne Arundel County Republican Central Comm. v. State Admin. Bd. of Election Laws,* 781 F.Supp. 394, 401 (D.Md.1991) (Niemeyer, J., dissenting)). Again, the Supreme Court's holding that there is no *de minimis* rule prevents us from reading this language as an indication that step 1 is satisfied if the deviations are not "significant." *See Stone v. Hechler,* 782 F.Supp. 1116, 1125 (N.D.W.Va. 1992) (rejecting the argument that no justification is necessary for variations that are not "significant").

light of each of the Guidelines. In conducting this inquiry, we compare at times the adopted plan to other plans before the legislature or the Special Committee, as well as to the other plans now before the court. We caution, however, that the adopted plan need not be superior to these other plans according to some or all of the legislature's criteria. Rather, we use these comparisons as a means to examine the adopted plan's success in light of the Guidelines. The court's task remains the evaluation of the adopted plan's constitutionality, not the determination of whether the court believes it to be the best possible plan. The key inquiry is whether the legislature made legitimate choices in balancing its various objectives, not whether the court would make the same choices.

First, the Kansas Congressional Redistricting Guidelines state that districts are to be based on counties and voting districts. The adopted plan splits just four counties and one voting district.[7] Geary County is split only to the extent necessary to keep Fort Riley all in one district.

Nothing in the record indicates that perfect equality is possible without splitting some counties and/or voting districts. While the Attorney General's plan creates fewer split counties and voting districts—three and one, respectively—it splits additional school districts and moves Osage and Coffey Counties, previously in the Second District, to the First District, diminishing the compactness of the First District.

Second, the Guidelines provide that redistricting is to have neither the purpose nor the effect of diluting minority voting strength.[8] There is nothing to suggest that the plan has either the purpose or the effect of diluting minority voting strength. A purpose of dilution has been neither alleged nor suggested by the evidence, and the minority populations in each district experience only minor changes—decreases in some districts and corresponding increases in others—in comparison to the 1992 congressional districts. No minority group constituted more than 8.8% of the voting age population in a 1992 district,

---

7. In comparison, the three minimum-deviation plans before the court split 3 (Graham), 3 (O'Neal), and 4 (Estes) voting districts, respectively. An affidavit from the Deputy Assistant Kansas Secretary of State in the Elections and Legislative Matters Division outlines the potential problems with splitting voting districts among congressional districts. *See also Vieth v. Pennsylvania*, 195 F.Supp.2d at 677 (acknowledging that keeping voting districts together is a legitimate interest because of administrative ease and cost concerns).

8. The Tribes, and, in vague terms, possibly the Junction City intervenors, appeared to raise a vote dilution argument in their initial pleadings. It appears their arguments have been abandoned. In any event, neither party has established a violation of section 2 of the Voting Rights Act, 42 U.S.C. § 1973. Under *Gingles*, minority plaintiffs must show three preconditions to show a violation of section 2: that their minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; that the

minority group is politically cohesive, in the sense that its members vote in a similar fashion; and that the white electorate votes as a bloc, thus usually enabling whites to defeat the minority group's preferred candidates at the polls. *Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986); *see also Growe v. Emison*, 507 U.S. 25, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (applying the *Gingles* preconditions to a single-member districting scheme). There has been no showing of the three prerequisites. Even assuming that it is permissible to combine more than one minority to meet the first prerequisite, there has been neither a showing of political cohesion among the minorities nor a showing that the white electorate votes as a bloc. *See, e.g., Growe*, 507 U.S. at 41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (assuming, without deciding, that it was permissible for the District Court to combine distinct ethnic and language minority groups). Furthermore, the numbers would appear to be insufficient even if such a showing were made.

and each of the changes has amounted to less than one percentage point.[9]

Third, and perhaps most important given the nature of the challenges in this case, the Guidelines instruct that "community of interests" should be recognized when possible in light of the "as nearly as practicable" equal population requirement. According to the Guidelines, this means that common social, cultural, racial, ethnic, and economic interests should be considered; the cores of the existing districts should be maintained if possible; and whole counties should be placed in the same districts. The adopted plan reflects the legislature's judgments regarding communities of interest. As noted above, just 4 counties are split under the plan. Under the adopted plan, the largest shift of total population is 9.1%, indicating that the 1992 districts have been preserved to a relatively high degree. Indeed, the Stipulated Facts reveal that none of the plans before the court achieves a lower figure, and the 6 plans considered by the Special Committee with deviations of 33 or fewer persons all created larger shifts. Nor can we agree with the Junction City intervenors' contention that the legislature did not carefully consider the decision to split the Junction City–Fort Riley area between two districts. The record reveals that both the majority and minority caucuses of the Spe-

cial Committee listed among their redistricting priorities the preservation of this community in one congressional district. The record also shows, however, that both caucuses had other priorities as well. For instance, the majority caucus prioritized certain other communities of interest. These priorities included keeping Wyandotte and Johnson Counties together in the Third District and keeping Fort Riley and Fort Leavenworth in the same district—and the plan adopted by the legislature achieves both these aims. Ultimately, the Special Committee in fact approved and recommended a plan that placed Geary County (except for Fort Riley) in the First District and Riley County in the Second. This plan, called "Caucus J," divided the City of Lawrence as well. Caucus J had a maximum population deviation of 132 persons, and it split 5 counties and 6 voting districts. While the legislature declined to adopt Caucus J, its recommendation by the Special Committee belies the claim that the decisions to separate Geary County from Riley County and to divide Lawrence were unconsidered ones. Moreover, the record reveals that, prior to the House's adoption of H. Sub. S.B. 152, an amendment was proposed that would have placed Geary County and Riley County in the Second District and all of Lawrence in the Third District. That amendment was

9.

| PERCENTAGES OF VOTING AGE POPULATION and TOTAL POPULATION | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Non–Hispanic Black | Non–Hispanic Am. Indian | Non–Hispanic Asian | Non–Hispanic Other | 2 or more Races | Hispanic | White |
| 1992 Congr. 1st D. | 1.4/1.6 | .8/.9 | .9/1.0 | .1/.1 | .7/1.0 | 8.8/11.1 | 91.6/89.8 |
| 2nd D. | 5.5/6.2 | 1.7/1.9 | 1.3/1.3 | .1/.2 | 1.3/1.8 | 3.4/4.1 | 89.3/87.9 |
| 3rd D. | 7.6/8.6 | 1.1/1.1 | 2.8/2.8 | .2/.3 | 1.1/1.5 | 5.7/6.4 | 85.1/83.5 |
| 4th D. | 6.2/7.1 | 1.8/2.0 | 2.6/2.7 | .2/.2 | 1.4/2.0 | 5.3/6.5 | 85.7/83.6 |
| H. Sub. SB. 152 1st D. | 2.0/2.3 | .8/.9 | 1.1/1.1 | .1/.1 | .8/1.1 | 8.6/10.9 | 90.9/89.0 |
| 2nd D. | 4.8/5.3 | 1.7/1.9 | 1.2/1.2 | .1/.2 | 1.2/1.7 | 3.2/3.8 | 90.2/89.0 |
| 3rd D. | 8.1/9.1 | 1.0/1.0 | 2.8/2.9 | .2/.3 | 1.1/1.5 | 6.0/6.8 | 84.3/82.7 |
| 4th D. | 6.2/7.1 | 1.8/2.0 | 2.6/2.7 | .2/.2 | 1.4/2.0 | 5.4/6.6 | 85.7/83.6 |

rejected. Given these facts, we conclude that the legislature made decisions about which communities of interest it could maintain and which should be split in order to achieve other redistricting aims.

Finally, the Guidelines prioritize contiguity and compactness. Each of the districts in H. Sub. S.B. 152 is contiguous, and based on a comparison with the other plans before the court and the plans considered · by the Special Committee, the adopted plan achieves a good measure of compactness. In fact, of the plans submitted by the parties, only O'Neal's plan achieves a higher mean compactness. O'Neal's plan achieves this higher compactness figure, however, by splitting additional voting districts and almost doubling the size of the largest shift in total population.

As *Karcher* instructs, the step 2 inquiry is a flexible one that requires careful attention to factors such as the size of the deviation, the importance of the state interests involved, how consistently the plan reflects those interests, and whether other alternatives might substantially further those interests while achieving lower deviations. 462 U.S. at 741, 103 S.Ct. 2653. Given the small size of the deviation, the adopted plan's effectiveness in serving the legislature's legitimate interests, and the failure of the challenging parties to present plans that are substantially superior to the adopted one, we conclude that the Kansas Legislature had adequate reasons for enacting a plan with a maximum devia-

tion of 33 persons, or 0.0049%, and that the plan satisfies the "as nearly as practicable" standard. The evidence reveals that the legislature was faced with difficult decisions to make regarding how to balance its priorities, including how to resolve conflicting claims ˙of various communities of interest. ˙Moreover, the legislature had previously rejected a plan with similar district lines but ·a larger maximum deviation—132 persons—which tends to indicate that there was˙a good faith effort to reduce population disparity. While the final decision's were not unanimous, either in the Special Committee or in the legislature as a whole, this disagreement does not detract from the fact that the legislature ultimately adopted the plan and that the plan is justifiable in light of the state's redistricting Guidelines.[10]

## C. Challenges to the Division of Communities of Interest

The Junction City intervenors argue that Fort Riley and Junction City constitute one "community of interest" and that they should therefore be contained within the same congressional district. Similarly, Graham argues that the City of Lawrence is a community of interest that should not be divided between two districts. The failure to maintain particular communities of interest in the same congressional districts, however, is insufficient to demonstrate that the redistricting plan adopted

---

**10.** In reaching this conclusion, we note that the Junction City intervenors' reliance on *Vieth v. Pennsylvania*, 195 F.Supp.2d 672, is misplaced. Although *Vieth* invalidated a population deviation of just 19 persons, it did so under factual circumstances that differ significantly from those presented here. In *Vieth*, the *only* justification offered was the aim of not splitting voting precincts, which the court acknowledged as a legitimate goal that might justify a population deviation of 19 persons.

*Id.* at 677. However, the court found that the proffered justification was "a mere pretext" because "the evidence has demonstrated that it is possible to draw a congressional district map with zero deviation and no precinct splits." *Id.* Moreover, the expert who drew the districts testified that he was instructed to manipulate the maps using census blocks, rather than whole precincts, which the court found to be inconsistent with the proffered justification. *Id.* at 677–78.

by the legislature is constitutionally infirm.[11]

We acknowledge that preserving communities of interest is a legitimate and traditional goal in drawing congressional districts. *Bush v. Vera,* 517 U.S. 952, 977, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996). Indeed, it is one of the goals explicitly included in the Kansas Legislature's Congressional Redistricting Guidelines and one of the concerns that justify the deviation of 33 persons. However, the fact that this is a legitimate *goal* does not mean that there is an individual constitutional *right* to have one's particular community of interest contained within one congressional district. Rather, it is the province of the state legislature to determine and apply redistricting priorities, so long as they do not conflict with constitutional mandates. This process will almost inevitably require some compromise among conflicting goals, as it will be virtually impossible to satisfy every priority to the fullest possible extent, and "the District Court's preferences do not override whatever state goals [are] embodied" in a legislature's plan. *White v. Weiser,* 412 U.S. 783, 796, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973). This is particularly the case with communities of interest, which may overlap and be defined in different ways, as the Guidelines themselves make clear. The Kansas Legislature considered specific communities of interest, along with other legitimate factors, and it decided to divide certain communities of interest in order to achieve a redistricting plan that pursues a combination of goals. Graham and the Junction City intervenors

have presented no evidence of bad faith by the legislature, which might have affected our evaluation of the proffered justifications. As this court stated in its last review of congressional redistricting in Kansas, "[w]hen, as here, the legislature has enacted and the governor has signed into law a redistricting plan, a federal court should defer to the plan if it is constitutionally acceptable." *Kansas ex rel. Stephan v. Graves,* 796 F.Supp. 468, 470 (D.Kan.1992). "[D]eference to a decision made by the state legislative and executive branches in this area, which is so necessarily political, is an important linchpin of judicial review." *Id.* This court cannot now replace the legislature's judgments with its own.

### III. Conclusion

■ The essence of the Junction City intervenors' claim is that Fort Riley and Junction City constitute a significant community of interest that deserves to be recognized by placement in the same congressional district. Graham makes the same claim with respect to the City of Lawrence. The Junction City intervenors have submitted various affidavits and letters to support the assertion that the Fort Riley–Junction City area is a community of interest of unusual significance. These materials are largely irrelevant, however. It is not the province of this court to judge whether the legislature's redistricting choice achieves the best possible solution for particular communities of interest. Nor is the court in a position to weigh the

---

**11.** The Intervenor Tribes similarly claim that the four Native American reservations in northeast Kansas constitute one community of interest and should remain in one congressional district. The Tribes filed a motion to intervene in response to Graham's first proposed redistricting map, which divided the Tribes into two districts and divided one reservation between two districts. However,

Graham has withdrawn his original plan and replaced it with one that keeps the four reservations in the Second District. Moreover, the redistricting plan passed by the state legislature places the reservations in one district, and no plan remaining before the court divides the Tribes among districts. We therefore find it unnecessary to address the Tribes' asserted interest.

relative importance or deservedness of particular communities of interest. Rather, our task is to determine whether, in light of Article I, Section 2, the legislature's judgments regarding these and its other redistricting concerns are sufficient to justify a deviation of 33 persons between the largest and the smallest districts. We conclude that, in passing H. Sub. S.B. 152, the legislature satisfied the one-person, one-vote requirement of Article I, Section 2.

For the foregoing reasons, judgment is rendered in favor of the defendant. The defendant's request for costs, including attorney fees and expenses, is DENIED.