# SUPREME COURT OF THE UNITED STATES

NATALIE E. TENNANT, WEST VIRGINIA SECRETARY
OF STATE, ET AL. *v.* JEFFERSON COUNTY
COMMISSION, ET AL.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

No. 11–1184.    Decided September 25, 2012

PER CURIAM.

Plaintiffs in this case claim that West Virginia's 2011 congressional redistricting plan violates the "one person, one vote" principle that we have held to be embodied in Article I, §2, of the United States Constitution. A three-judge District Court for the Southern District of West Virginia agreed, declaring the plan "null and void" and enjoining West Virginia's Secretary of State from implementing it. App. to Juris. Statement 4. The state defendants appealed directly to this Court. See 28 U. S. C. §1253. Because the District Court misapplied the standard for evaluating such challenges set out in *Karcher* v. *Daggett*, 462 U. S. 725 (1983), and failed to afford appropriate deference to West Virginia's reasonable exercise of its political judgment, we reverse.

*  *  *

Article I, §2, of the United States Constitution requires that Members of the House of Representatives "be apportioned among the several States . . . according to their respective Numbers" and "chosen every second Year by the People of the several States." In *Wesberry* v. *Sanders*, 376 U. S. 1 (1964), we held that these commands require that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Id.,* at 7–8. We have since explained that the "as nearly as is practicable" standard does not require that congressional

districts be drawn with "precise mathematical equality," but instead that the State justify population differences between districts that could have been avoided by "a good-faith effort to achieve absolute equality." *Karcher*, *supra*, at 730 (quoting *Kirkpatrick* v. *Preisler*, 394 U. S. 526, 530–531 (1969); internal quotation marks omitted).

*Karcher* set out a two-prong test to determine whether a State's congressional redistricting plan meets this standard. First, the parties challenging the plan bear the burden of proving the existence of population differences that "could practicably be avoided." 462 U. S., at 734. If they do so, the burden shifts to the State to "show with some specificity" that the population differences "were necessary to achieve some legitimate state objective." *Id.,* at 741, 740. This burden is a "flexible" one, which "depend[s] on the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests yet approximate population equality more closely." *Id.,* at 741. As we recently reaffirmed, redistricting "ordinarily involves criteria and standards that have been weighed and evaluated by the elected branches in the exercise of their political judgment." *Perry* v. *Perez*, 565 U. S. ___, ___ (2012) (*per curiam*) (slip op., at 4). "[W]e are willing to defer to [such] state legislative policies, so long as they are consistent with constitutional norms, even if they require small differences in the population of congressional districts." *Karcher*, *supra*, at 740.

In this case, plaintiffs claim that West Virginia's redistricting plan, adopted following the 2010 decennial United States census, violates Article I, §2, of the United States Constitution and, separately, the West Virginia Constitution. The 2010 census did not alter West Virginia's allocation of three congressional seats. But due to population shifts within the State, West Virginia nonetheless

began redistricting to comply with the requirements in our precedents.

In August 2011, the West Virginia Legislature convened an extraordinary session, and the State Senate formed a 17-member Select Committee on Redistricting. The committee first considered a redistricting plan championed by its chair, Majority Leader John Unger, and dubbed "the Perfect Plan" because it achieved a population difference of a single person between the largest and smallest districts. That appears, however, to have been the only perfect aspect of the Perfect Plan. State legislators expressed concern that the plan contravened the State's longstanding rule against splitting counties, placed two incumbents' residences in the same district, and moved one-third of the State's population from one district to another.

The following day, members of the Redistricting Committee introduced seven additional plans. The committee eventually reported to the full Senate the eighth proposal, referred to as S. B. 1008. The full Senate rejected a ninth proposal offered as an amendment on the floor and adopted S. B. 1008 by a vote of 27 to 4. The House of Delegates approved the bill without debate by a vote of 90 to 5. Governor Earl Tomblin signed the bill into law on August 18, 2011.

S. B. 1008, codified at W. Va. Code Ann. §1–2–3 (Lexis 2012 Supp.), does not split county lines, redistrict incumbents into the same district, or require dramatic shifts in the population of the current districts. Indeed, S. B. 1008's chief selling point was that it required very little change to the existing districts: It moved just one county, representing 1.5% of the State's population, from one district to another. This was the smallest shift of any plan considered by the legislature. S. B. 1008, however, has a population variance of 0.79%, the second highest variance of the plans the legislature considered. That is, the popu-

lation difference between the largest and smallest districts in S. B. 1008 equals 0.79% of the population of the average district.

The Jefferson County Commission and two of its county commissioners sued to enjoin the State from implementing S. B. 1008. At trial, the State conceded that it could have adopted a plan with lower population variations. The State argued, however, that legitimate state policies justified the slightly higher variances in S. B. 1008, citing this Court's statement from *Karcher* that "[a]ny number of consistently applied legislative policies might justify some variance, including, for instance, making districts compact, respecting municipal boundaries, preserving the cores of prior districts, and avoiding contests between incumbent Representatives." 462 U. S., at 740. The State noted *Karcher*'s approving reference to a District Court opinion upholding a previous West Virginia redistricting plan with a population variance of 0.78%—virtually identical to the variance in S. B. 1008. See *id.,* at 740–741 (citing *West Virginia Civil Liberties Union* v. *Rockefeller*, 336 F. Supp. 395 (SD W. Va. 1972)).

The District Court nonetheless granted the injunction, holding that the State's asserted objectives did not justify the population variance. With respect to the objective of not splitting counties, the District Court acknowledged that West Virginia had never in its history divided a county between two or more congressional districts. The court speculated, however, that the practice of *other* States dividing counties between districts "may portend the eventual deletion" of respecting such boundaries as a potentially legitimate justification for population variances. App. to Juris. Statement 15, n. 6. The court also faulted the West Virginia Legislature for failing "to create a contemporaneous record sufficient to show that S. B. 1008's entire 4,871-person variance—or even a discrete, numerically precise portion thereof—was attributable" to

the State's interest in respecting county boundaries and noted that several other plans under consideration also did not split counties. *Id.,* at 15, 16.

The court further questioned the State's assertion that S. B. 1008 best preserved the core of existing districts. Preserving the core of a district, the court reasoned, involved respecting the "'[s]ocial, cultural, racial, ethnic, and economic interests common to the population of the area,'" *id.,* at 17 (quoting *Graham* v. *Thornburgh*, 207 F. Supp. 2d 1280, 1286 (Kan. 2002)), not a "dogged insistence that change be minimized for the benefit of the delicate citizenry," App. to Juris. Statement 20. The District Court concluded that although acclimating to a new congressional district and Congressperson "may give rise to a modicum of anxiety and inconvenience, avoiding constituent discomfort at the margins is not among those policies recognized in *Karcher* as capable of legitimizing a variance." *Ibid.*

With respect to preventing contests between incumbents, the District Court again faulted the legislature for failing to build a record "linking all or a specific part of the variance" to that asserted interest. *Id.*, at 22. And the District Court found that although 0.79% was a minor variation when *Karcher* was decided, the feasibility of achieving smaller variances due to improved technology meant that the same variance must now be considered major. Because the District Court concluded that the redistricting plan was unconstitutional under Article I, §2, it did not reach plaintiffs' challenges under the West Virginia Constitution.

Chief Judge Bailey dissented. He argued that the record demonstrated the legitimacy of the State's concerns, and that no other plan satisfied all those concerns as well as S. B. 1008. He also took issue with the majority's disregard for *Karcher*'s characterization of 0.78% as an acceptable disparity. App. to Juris. Statement 39.

We stayed the District Court's order pending appeal to

this Court, 565 U. S. ___ (2012), and now reverse.

Given the State's concession that it could achieve smaller population variations, the remaining question under *Karcher* is whether the State can demonstrate that "the population deviations in its plan were necessary to achieve some legitimate state objective." 462 U. S., at 740. Considering, as *Karcher* instructs, "the size of the deviations, the importance of the State's interests, the consistency with which the plan as a whole reflects those interests, and the availability of alternatives that might substantially vindicate those interests," *id.,* at 741, it is clear that West Virginia has carried its burden.

As an initial matter, the District Court erred in concluding that improved technology has converted a "minor" variation in *Karcher* into a "major" variation today. Nothing about technological advances in redistricting and mapping software has, for example, decreased population variations between a State's counties. See *id.*, at 733, n. 5. Thus, if a State wishes to maintain whole counties, it will inevitably have population variations between districts reflecting the fact that its districts are composed of unevenly populated counties. Despite technological advances, a variance of 0.79% results in no more (or less) vote dilution today than in 1983, when this Court said that such a minor harm could be justified by legitimate state objectives.

Moreover, our cases leave little doubt that avoiding contests between incumbents and not splitting political subdivisions are valid, neutral state districting policies. See, *e.g.*, *id.,* at 740. The majority cited no precedent for requiring legislative findings on the "discrete, numerically precise portion" of the variance attributable to each factor, and we are aware of none.

The District Court dismissed the State's interest in limiting the shift of population between old and new districts as "ham-handed," *id.,* at 19, because the State con-

sidered only "discrete bounds of geography," rather than "'[s]ocial, cultural, racial, ethnic, and economic interests common to the population of the area.'" *Id.,* at 17 (quoting *Graham* v. *Thornburgh, supra*, at 1286). According to the District Court, that did not qualify as "preserving the cores of prior districts" under *Karcher*, 462 U. S., at 740–741.

Regardless of how to read that language from *Karcher*, however, our opinion made clear that its list of possible justifications for population variations was not exclusive. See *id.,* at 740 ("Any number of consistently applied legislative policies might justify some variance, including, for instance, . . ."). The desire to minimize population shifts between districts is clearly a valid, neutral state policy. See, *e.g., Turner* v. *Arkansas*, 784 F. Supp. 585, 588–589 (ED Ark. 1991), summarily aff'd, 504 U. S. 952 (1992). S. B. 1008 achieves significantly lower population shifts than the alternative plans—more than four times lower than the closest alternative, and more than 25 times lower than others.

None of the alternative plans came close to vindicating all three of the State's legitimate objectives while achieving a lower variance. All other plans failed to serve at least one objective as well as S. B. 1008 does; several were worse with respect to two objectives; and the Perfect Plan failed as to all three of the State's objectives. See App. to Juris. Statement 43–45. This is not to say that anytime a State must choose between serving an additional legitimate objective and achieving a lower variance, it may choose the former. But here, given the small "size of the deviations," as balanced against "the importance of the State's interests, the consistency with which the plan as a whole reflects those interests," and the lack of available "alternatives that might substantially vindicate those interests yet approximate population equality more closely," *Karcher, supra,* at 741, S. B. 1008 is justified by the

State's legitimate objectives.

Because the District Court did not reach plaintiffs' claims under the West Virginia Constitution and the issue has not been briefed by the parties, we leave it to the District Court to address the remaining claims in the first instance.   The judgment of the United States District Court for the Southern District of West Virginia is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*