**[J-20-2022] [MO: Baer, C.J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

| | | |
|---|---|---|
| CAROL ANN CARTER, MONICA PARRILLA, REBECCA POYOUROW, WILLIAM TUNG, ROSEANNE MILAZZO, BURT SIEGEL, SUSAN CASSANELLI, LEE CASSANELLI, LYNN WACHMAN, MICHAEL GUTTMAN, MAYA FONKEU, BRADY HILL, MARY ELLEN BALCHUNIS, TOM DEWALL, STEPHANIE MCNULTY AND JANET TEMIN, | : : : : : : : : : : : : | No. 7 MM 2022 <br><br> ARGUED: February 18, 2022 |
| Petitioners | : : : | |
| v. | : : : : : | |
| LEIGH M. CHAPMAN, IN HER OFFICIAL CAPACITY AS THE ACTING SECRETARY OF THE COMMONWEALTH OF PENNSYLVANIA; JESSICA MATHIS, IN HER OFFICIAL CAPACITY AS DIRECTOR FOR THE PENNSYLVANIA BUREAU OF ELECTION SERVICES AND NOTARIES, | : : : : : : : : : | |
| Respondents | : : : | |
| ------------------------------------------------------------ <br> PHILIP T. GRESSMAN; RON Y. DONAGI; KRISTOPHER R. TAPP; PAMELA GORKIN; DAVID P. MARSH; JAMES L. ROSENBERGER; AMY MYERS; EUGENE BOMAN; GARY GORDON; LIZ MCMAHON; TIMOTHY G. FEEMAN; AND GARTH ISAAK, | : : : : : : : : : : : | |
| Petitioners | : : : | |
| v. | : : : : : | |

LEIGH M. CHAPMAN, IN HER OFFICIAL   :
CAPACITY AS THE ACTING SECRETARY   :
OF THE COMMONWEALTH OF   :
PENNSYLVANIA; JESSICA MATHIS, IN   :
HER OFFICIAL CAPACITY AS DIRECTOR   :
FOR THE PENNSYLVANIA BUREAU OF   :
ELECTION SERVICES AND NOTARIES,   :
   :
            Respondents   :

### DISSENTING OPINION

OPINION FILED: **March 9, 2022**

**JUSTICE BROBSON**           DECIDED: **February 23, 2022**

### I. One Person, One Vote

Article I, Section 2 of the United States Constitution,[1] as interpreted by the Supreme Court of the United States, commands that congressional districts be apportioned to achieve population equality—"one person, one vote." *See Evenwel v. Abbott*, 578 U.S. 54 (2016); *Tennant v. Jefferson Cnty. Comm'n*, 567 U.S. 758 (2012) (per curiam); *Karcher v. Daggett*, 462 U.S. 725 (1983); *Wesberry v. Sanders*, 376 U.S. 1 (1964). There is no *de minimis* exception to this constitutional imperative. *Karcher*, 462 U.S. at 730-38; *see also Vieth v. Pennsylvania*, 188 F. Supp. 2d 532, 542 (M.D. Pa. 2002) ("[T]he [United States] Supreme Court has squarely rejected any *de minimis* exception to the requirement of absolute equality in population between districts."). Rather, the equal representation standard of the United States Constitution requires that "as nearly as is practicable one man's vote in a congressional election is to be worth as much as another's." *Wesberry*, 376 U.S. at 7-8.

The United States Supreme Court has established a two-prong test to evaluate the constitutionality of a congressional reapportionment plan under the one-person, one-vote

---

[1] "The House of Representatives shall be composed of Members *chosen . . . by the People of the several States . . . .*" U.S. Const. art. I, § 2 (emphasis added).

standard. The first question asks whether the population differences could practicably have been avoided through good-faith effort. *Karcher*, 462 U.S. at 730. If so, the second question asks whether the differences were nonetheless necessary to achieve a legitimate state objective. *Tennant*, 567 U.S. at 760 (citing *Karcher*, 462 U.S. at 740-41). Although we are not here being asked to evaluate the constitutionality of a reapportionment plan enacted through the legislative process outlined in our Pennsylvania Constitution, the one-person, one-vote standard and the *Karcher* test apply with equal force to a judicially created plan.

The Carter Plan, as it is called, fails the *Karcher* test. It proposes 17 congressional districts—four with the ideal population of 764,865, four with a population of 764,866 (plus one), and nine with a population of 764,864 (minus one). The Carter Plan, therefore, provides for a two-person population deviation between the largest and smallest congressional districts. While I acknowledge that it is mathematically impossible to create 17 districts of precisely equal population, it is possible, with good faith, to craft a plan with less than a two-person deviation. Indeed, of the 13 proposed reapportionment plans provided to this Court for its consideration, only two proposed a deviation of more than one person. The Carter Plan is one of those two. Moreover, the Carter Petitioners, in their Brief in Support of Exceptions to the Special Master's Report (Carter Brief), acknowledge that it was possible to create a plan with a one-person deviation. (Carter Br. at 11 n.5.) The Carter Plan, therefore, fails the first part of the *Karcher* test.

The majority, nonetheless, has chosen the Carter Plan over the 11 other plans with only a one-person deviation. Applying the second prong of the *Karcher* test, then, it is the burden of the Carter Petitioners, and the majority by extension, to show that the two-person deviation in the Carter Plan is "necessary to achieve a legitimate state objective." *Tennant*, 567 U.S. at 760. Again, the presence of other plans before the Court

that satisfy all state and federal redistricting criteria with only a one-person deviation proves the contrary. The majority concludes, however, that the Carter Petitioners "have satisfied their burden by stating, with specificity, that the two-person deviation was required to prevent [an] additional split of a Vote Tabulation District [(VTD)]," which it contends is a recognized legitimate state interest. (Maj. Op. at 31.) In support, the majority relies on this Court's decision in *Mellow v. Mitchell*, 607 A.2d 204 (Pa. 1992).

In *Mellow*, this Court adopted the master's recommendation to approve a proposed reapportionment plan with a total maximum population deviation of 0.0111% over a proposed redistricting plan with a total maximum population deviation of 0.0000017%, the latter of which represented a difference of just one person. *Mellow*, 607 A.2d at 208, 215, 218. In making his recommendation, however, the master acknowledged that the proposed reapportionment plan with the lowest population deviation "[fell] below other[] [proposed reapportionment plans] precisely because the cost of achieving maximum mathematical equality lies in having the congressional district boundaries split 22 election precincts as well as 27 local governments." *Id.* at 218. The proposed reapportionment plan that was ultimately adopted by this Court, on the other hand, split only three precincts. *Id.*

I have no qualms about accepting a small increase in the population deviation between districts to avoid splitting *19* additional election precincts. However, here, unlike the *Mellow* Court, the majority has made no attempt to evaluate whether the Carter Plan performs superiorly with respect to splits of VTDs when compared to the 11 other plans that achieved only a one-person deviation. Rather, the majority simply claims that avoiding the split of just one additional VTD (not 19 election precincts, as was the case in *Mellow*) constitutes a legitimate state interest that justifies the two-person population deviation of the Carter Plan; satisfies the one-person, one-vote standard; and elevates

the Carter Plan above all other plans that achieved population equality closer to zero. *Mellow* simply cannot bear the weight of the majority's reliance.

Moreover, while the majority appears willing to look past the 11 other proposed plans that achieve closer-to-zero population equality in order to save one VTD in the Carter Plan, it seems unphased by the fact that, while saving this one VTD, the Carter Plan is the only proposed plan that splits the City of Williamsport (Lycoming County). Indeed, Dr. Daryl DeFord, on whom the majority relies to support its selection of the Carter Plan (Maj. Op. at 24), criticizes the Carter Plan for this particular split: "[O]ne plan (Carter) splits the city of Williamsport, whose population of 27,754 *is nowhere near to necessitating a split.*"[2]  Rebuttal Report of D. DeFord (for Gressman Math/Science Petitioners) at 6 (Jan. 26, 2022) (emphasis added).  By selecting the Carter Plan, the majority improperly saves a VTD that purportedly had to be split to ensure as close to equal population as practicable among the districts at the expense of an entirely unnecessary split of the City of Williamsport.  No legitimate state interest can be found in this tradeoff.

For the above reasons, I respectfully disagree with the majority's reading of *Mellow* and its conclusion that the Carter Plan satisfies the one-person, one-vote standard. Article I, Section 2 of the United States Constitution protects the sanctity of one person, one vote, not one VTD.  Accordingly, because I believe that the Carter Plan violates

---

[2] In *League of Women Voters v. Commonwealth*, 175 A.3d 282 (Pa. 2018) (*LWV I*) (mem.) (per curiam), this Court specifically noted that any congressional reapportionment plan submitted to the Pennsylvania Governor by the Pennsylvania General Assembly for consideration "shall consist of:  congressional districts composed of compact and contiguous territory; as nearly equal in population as practicable; and which do not divide any county, city, incorporated town, borough, township, or ward, *except where necessary to ensure equality of population.*"  *LWV I*, 175 A.3d at 290 (emphasis added).

Article I, Section 2 of the United States Constitution, I must dissent from the majority's selection of that plan.

## II.  Neutral Standards/Methods Over Partisan Metrics

Separately, it has been 60 years since the United States Supreme Court first waded into the "political thicket" to review and remedy malapportionment challenges.  *See Baker v. Carr*, 369 U.S. 186 (1962).[3]  Since then, the United States Supreme Court has also waded into the thicket, rightly so, to address and remedy race-based or ethnic redistricting decisions that violate the Equal Protection Clause of the United States Constitution[4] and/or the Voting Rights Act of 1965.[5]  *See, e.g.*, *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Cooper v. Harris*, 137 S. Ct. 1455 (2017).  Yet, the United States Supreme Court has refused to do so to address and remedy claims of excessive partisanship in the redistricting process, finding such claims nonjusticiable in the federal courts.  *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019).

Much ink has been spilt in this case about this Court's decision in *League of Women Voters v. Commonwealth*, 178 A.3d 737 (Pa. 2018) (*LWV II*).  In *LWV II*, this Court held that challenges to congressional redistricting plans for *excessive* partisanship—*i.e.*, partisan gerrymanders—are justiciable under the Free and Equal

---

[3] Two decades before *Baker*, Justice Frankfurter, writing for a plurality, affirmed the dismissal of a malapportionment challenge to congressional districts as involving a nonjusticiable political question.  *Colegrove v. Green*, 328 U.S. 549 (1946) (plurality opinion), *abrogated by Baker*, 369 U.S. 186.  "To sustain this action," Justice Frankfurter wrote, "would cut very deep into the very being of Congress.  Courts ought not to enter this political thicket."  *Colegrove*, 328 U.S. at 556.

[4] "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1.

[5] 52 U.S.C. § 10101 *et seq.*

Elections Clause of the Pennsylvania Constitution.[6]  *LWV II*, 178 A.3d at 801-14.  In reaching this conclusion, the Court examined challenges to the Congressional Redistricting Act of 2011 (2011 Plan), Act of December 22, 2011, P.L. 598, 25 P.S. §§ 3596.101-.1501,[7] and determined that the 2011 Plan constituted an excessive partisan gerrymander in violation of the Free and Equal Elections Clause.  *Id.* at 818-21.

In *LWV II*, then, this Court waded into the political thicket to review and remedy excessive partisan gerrymanders under the Pennsylvania Constitution.  *Id.* at 821-24.  In so doing, the Court interpreted the Free and Equal Election Clause as protecting voters from congressional districts that create an "unfair," or unconstitutional, partisan advantage.  *Id.* at 817.  The Court concluded that a particular redistricting plan crosses the line from fair to unfair and, thus, is unconstitutional, when such plan subordinates neutral criteria—*i.e.,* "compactness, contiguity, minimization of the division of political subdivisions, and maintenance of population equality among congressional districts"—"to extraneous considerations such as gerrymandering for *unfair* partisan political advantage."  *Id.* (emphasis added).  By extension, any redistricting plan that does not cross that line is both fair and constitutional*.*

In short, *LWV II* is a partisan gerrymandering case.  The current matter before this Court, however, is not a partisan gerrymandering case.  Indeed, no one in this litigation has challenged any of the proposed plans as an unconstitutional partisan gerrymander under *LWV II.*  *LWV II* recognizes that the Free and Equal Elections Clause protects Pennsylvanians from *excessive, unconstitutional, and thus unfair* partisanship in the drawing of legislative districts.  It does not, however, create any right in the people of

---

[6] "Elections shall be free and equal; and no power, civil or military, shall at any time interfere to prevent the free exercise of the right of suffrage."  Pa. Const. art. 1, § 5.

[7] The 2011 Plan was held unconstitutional by *LWV I.*

Pennsylvania to the fairest among fair and lawful maps. The "fairest of the fair" inquiry is not a thicket; it is a quagmire. It is an entirely subjective, partisan, and quintessentially political inquiry that belongs in the political branches of our government, not in the courts.

Respectfully, the majority,[8] in my view, grossly misreads the very narrow decision in *LWV II*, emboldening this Court to serve as the mirror on the wall and choose the fairest map of them all. (Maj. Op. at 18 ("[W]e conclude that consideration of partisan fairness, when selecting a plan among several that meet the traditional core criteria, is necessary to ensure that a congressional plan is reflective of and responsive to the partisan preferences of the Commonwealth's voters."), 27 (noting Carter Plan "is reflective of and responsive to the partisan preferences of the Commonwealth's voters"), 36-37 (addressing partisan fairness and partisan metrics in its support of Carter Plan).) The majority has essentially emerged from the political thicket and jumped into the partisan quagmire. The long-term harm to the congressional redistricting process is not the majority's adoption of the Carter Plan, but the analysis that the majority uses to break a partisan impasse and choose among the 13 proposed reapportionment plans, all but a few of which satisfy the neutral redistricting criteria.

---

[8] Although Justices Dougherty and Wecht join the majority opinion, they also file concurring opinions that, while accepting the use of partisan metrics when analyzing the proposed redistricting plans in this matter, do not embrace the use of those metrics with the fulsome enthusiasm expressed in the majority opinion. Rather, Justice Dougherty recognizes "that the metrics for this criterion remain somewhat in flux when compared to the more standardized measures of the traditional core criteria." (Concurring Op. at 4 n.1 (Dougherty, J., concurring).) He further recognizes that no partisan fairness standard has emerged in this case. As for Justice Wecht, he recognizes in his concurring opinion that "the partisan fairness metrics used to evaluate the [13] submitted maps are useful heuristics to approximate partisan outcomes under conditions that have never occurred," but he "caution[s] against surrendering to the allure of those metrics at the front end of an analysis." (Concurring Op. at 14 (Wecht, J., concurring).) He observes that while the numbers may be "helpful to a comprehensive examination, . . . they must not be dispositive." (*Id.*) Instead, he would relegate them to "a gut-check at the culmination of the process, rather than as a gatekeeping function at the start." (*Id.*)

By considering numerical partisan metrics and ultimately adopting a reapportionment plan because it provides for "proportionality," avoids "anti-majoritarian" results, and attempts to offset a "structural tilt" in the political geography of Pennsylvania that favors Republican candidates,[9] the majority has invited, not discouraged, this Court's future involvement in the congressional redistricting process, whether in impasse litigation, such as this one; a partisan gerrymander challenge, such as the *LWV* litigation; or a "fairness" challenge to a legislatively enacted reapportionment plan signed into law by the governor. While the "least-change" approach—a neutral tool that in its purest form only makes minor revisions to existing legislative districts to account for population changes—purportedly used to create the Carter Plan may be imperfect,[10] it would have

---

[9] *See, e.g.*, Report of M. Duchin (for Governor Wolf) at 2, 6 (Jan. 24, 2022); Report of J. Rodden (for Carter Petitioners) at 25 (Jan. 24, 2022) (noting that Carter Plan is "reflective of Pennsylvania's statewide partisan preferences"); Report of J. Rodden (for Carter Petitioners) at 11 (Jan. 26, 2022) (criticizing plans that "would likely lead to counter-majoritarian outcomes").

[10] In a recent decision, the Wisconsin Supreme Court adopted the least-change approach as a neutral method to remedy the failure of Wisconsin's legislative and executive branches to enact a congressional redistricting plan. *See Johnson v. Wis. Elections Comm'n*, 967 N.W.2d 469, 488-92 (Wis. 2021). In so doing, the court recognized that "[t]he existing maps were adopted by the legislature, signed by the governor, and survived judicial review by the federal courts" and that "[t]reading further than necessary to remedy their current legal deficiencies . . . would intrude upon the constitutional prerogatives of the political branches and unsettle the constitutional allocation of power." *Id.* at 488. Thus, the court believed that the application of the least-change approach was a method by which it could remedy the malapportionment of Wisconsin's districts, following the 2020 Census, without "endors[ing] the policy choices of the political branches" of Wisconsin's government. *Id.* at 492. The circumstances presented in this matter, however, are different. Here, the Carter Plan applies the least-change approach to an 18-district congressional plan created by this Court (2018 Plan), not a plan enacted through the legislative process set forth in the Pennsylvania Constitution. Moreover, as a result of the 2020 Census, a congressional district must be eliminated. Thus, in order to apply the least-change approach to the 2018 Plan to arrive at the Carter Plan, the Carter Petitioners' expert, Dr. Jonathan Rodden, did more than simply redraw certain district boundaries to achieve population equality; he eliminated completely, and necessarily, one congressional district. As a result, for many Pennsylvanians, particularly

been preferable, in my view, for the majority to have full-throatedly adopted it instead of using unquestionably partisan constructs to justify its selection of the Carter Plan. In my judgment, where the judiciary is forced to adopt a legislative reapportionment plan, the court should hew closely to nonpartisan standards (*e.g.*, compactness, contiguity, minimizing splits, etc.) or nonpartisan methods (*e.g.*, the "least-change" approach), eschewing partisan considerations or partisan approaches.

---

those along the Route 15 and Interstate 80 corridors, the least-change approach yields a big change in terms of who will represent them in Washington, D.C.